**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JANE DOE (R.N.H.), AN INDIVIDUAL<br><br>Plaintiff,<br><br>v.<br><br>WYNDHAM HOTELS & RESORTS, INC.; DAYS INNS WORLDWIDE, INC; OM KRUPA MAA LLC; S & S INVESTMENT ENTERPRISES, LLC D/B/A SA HAIN HOLDINGS, LLC; AND PREET HOSPITALITY INC.<br><br>Defendants. | CIVIL ACTION NO: |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

Jane Doe (R.N.H.), Plaintiff in the above-styled and numbered cause, files this Original Complaint against WYNDHAM HOTELS & RESORTS, INC., DAYS INNS WORLDWIDE. INC, OM KRUPA MAA LLC; S & S INVESTMENT ENTERPRISES, LLC D/B/A SA HAIN HOLDINGS, LLC; AND PREET HOSPITALITY INC. as Defendants, and would respectfully show the Court and jury as follows.

## SUMMARY

1. Jane Doe (R.N.H.) files this civil lawsuit seeking compensation for the harm she suffered as a result of the sex trafficking she endured in a hotel owned, operated, maintained, and controlled by Defendants and their agents and employees.

2. Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or

1

coercion.[1] To "harbor" means to "give shelter or refuge to."[2] Traffickers or 'pimps', who use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will, often use hotels to harbor their victims.

3.      Some victims are brought into trafficking through abduction or use of physical violence, while many other trafficking relationships begin with a false promise of a romantic relationship or financial security.[3] Traffickers often prey on individuals with vulnerabilities that make them more susceptible to coercion and control.[4]

4.      Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for traffickers and sex buyers.

5.      Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

6.      In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

7.      As discussed herein, Defendants derived financial benefit from facilitating sex trafficking by providing venues where traffickers could exploit victims, including victims like

---

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.
[2] *Doe v. Hotels*, 6:23-CV-1012, 2024 WL 2955728, at *6 (M.D. Fla. June 12, 2024) (quoting Merriam-Webster Dictionary).
[3] The National Prevention Toolkit, Sex Trafficking, https://nationaltoolkit.csw.fsu.edu/leo/part-2/sex-trafficking
[4] Polaris Project, Sex Trafficking: The Basics, https://polarisproject.org/understanding-human-trafficking/

2

Jane Doe (R.N.H.) with minimal risk of detection or interruption. Defendants continued supporting traffickers, including Jane Doe (R.N.H.)'s trafficker, despite evident and apparent signs of widespread and ongoing sex trafficking in these hotels. Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

## PARTIES

8.      Jane Doe (R.N.H.) is a resident of Saint Augustine, Florida. She may be contacted through her lead counsel, whose information is contained below.

9.      (R.N.H.) is a victim of sex trafficking under 18 U.S.C. §1591(a) because she was harbored, transported, or provided for the purpose of causing her, through force, fraud, or coercion, to commit a commercial sex act.

10.     Given the nature of the allegations in this lawsuit, there is a collective and compelling interest in not publicly revealing the identity of (R.N.H.)

11.     Wyndham Hotels & Resorts, Inc., ("WHR") is a for-profit Delaware corporation with its principal place of business in Parsippany, New Jersey and may be served through its registered agent for service Corporate Creations Network Inc. at 3411 Silverside Road, Rodney Building #104, Wilmington, Delaware 19810.

12.     All references to WHR include any department, division, office, agency, subsidiary, corporate affiliate, predecessor corporation, or successor corporation, whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority or implied/apparent authority), employee, person, firm, or corporation acting on behalf of Wyndham Hotels and Resorts, Inc. now or at any time relevant to the claims herein.

3

13.    Days Inns Worldwide, Inc. is a for-profit Delaware corporation with its principal place of business in Parsippany, New Jersey. Defendant Days Inns Worldwide, Inc. may be served through its registered agent for service Corporate Creations Network Inc. at 1521 Concord Pike, Suite 201, Wilmington, Delaware 19803.

14.    All references to Days Inns Worldwide, Inc. include any department, division, office, agency, subsidiary, corporate affiliate, predecessor corporation, or successor corporation, whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority or implied/apparent authority), employee, person, firm, or corporation acting on behalf of Days Inns Worldwide, Inc. now or at any time relevant to the claims herein.

15.    WHR and Days Inn Worldwide, Inc. are referred to collectively as the "Wyndham Defendants" or "Wyndham" or "Franchisor Defendants."

16.    Upon information and belief, the Wyndham Defendants, either directly or through the acts of predecessors for which they are responsible, owned, operated, controlled, and/or managed the hotels located at:

   a.   10801 East Freeway, Houston, Texas 77029 ("Days Inn East");

   b.   11002 Northwest Freeway, Houston, Texas 77092 ("Days Inn Northwest"); and

   c.   10137 North Freeway, Houston, Texas 77038 ("Days Inn North").

17.    Defendant Om Krupa Maa LLC is a Texas company with its principal place of business in Texas. Defendant Om Krupa Maa LLC., during the period at issue, owned, operated, controlled, and/or managed the Days Inn located at 10801 East Freeway, Houston, TX 77029, through the Wyndham franchising system. Om Krupa Maa LLC may be served through its registered agent, Kailash Patel, 15831 2nd Street, Channelview, TX 77530. Om Krupa Maa LLC.

4

will be referred to herein as "Franchisee" "Days Inn East Franchisee" or "Franchisee Defendant."

18.    Defendant S & S Investment Enterprises, LLC d/b/a Sa Jain Holdings, LLC is a California company with its principal place of business in California. Defendant S & S Investment Enterprises, LLC d/b/a Sa Jain Holdings, LLC., during the period at issue, owned, operated, controlled, and/or managed the Days Inn located at 10137 North Freeway, Houston, Texas 77037, through the Wyndham franchising system. S & S Investment Enterprises, LLC d/b/a Sa Jain Holdings, LLC may be served through its registered agent Paul A Rianda, located at 38 Corporate Park, Irvine, CA 92623. S & S Investment Enterprises, LLC d/b/a Sa Jain Holdings, LLC will be referred to herein as "Franchisee" "Days Inn North Franchisee" or "Franchisee Defendant."

19.    Defendant Preet Hospitality Inc is a Texas company with its principal place of business in Texas. Defendant Preet Hospitality Inc, during the period at issue, owned, operated, controlled, and/or managed the Days Inn located at 11002 Northwest Freeway, Houston, TX 77092 through the Wyndham franchising system. Preet Hospitality Inc may be served through its registered agent, Chandrakant N. Patel located at 11002 Northwest Freeway Houston, TX 77092. Preet Hospitality Inc will be referred herein as "Franchisee" "Days Inn Northwest Franchisee" or Franchisee Defendant."

**JURISDICTION AND VENUE**

20.    This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more Defendants reside in this district and all Defendants are residents of New Jersey for purpose of venue under 28 U.S.C. §§ 1391(c).

22.     Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the District of New Jersey.

23.     All Wyndham Defendants have the same principal place of business, which is in Parsippany, New Jersey, within the District of New Jersey. Corporate activities related to the operation of each of the Subject Days Inn locations occurred at this New Jersey headquarters, and documents related to each of the Subject Days Inn locations are stored and maintained at this New Jersey headquarters.

24.     Plaintiff's claims against of the Franchisee Defendants arise out of each Franchisee Defendant's contacts with New Jersey through it franchising relationship with the Wyndham Defendants. These franchising relationships were centered at the Wyndham Defendants' principal place of business in the District of New Jersey. Each of the Franchisee Defendant's participation in a venture with the Wyndham Defendants operating its respective hotel occurred, in substantial part, in New Jersey. For example:

a. Upon information and belief, each Franchisee Defendant actively sought out a franchising relationship by contacting the Wyndham Defendants in New Jersey.

b. The franchising agreement had a choice of law provision selecting the law of New Jersey as the governing law.

c. Each Franchisee Defendant agreed to resolve all disputes with the Wyndham Defendants by mediation, arbitration and/or litigation in New Jersey.

d. Each Franchisee Defendant agreed to submit all notices required under the franchising agreement to the Wyndham Defendants in New Jersey.

e.  The Wyndham Defendants dictated rules and policies related to operation of the Subject Days Inn locations, including those related to safety, security, human trafficking, employee training and response, from their principal place of business in New Jersey.

f.  Each Franchisee Defendant was required to submit regular reports regarding financial performance, guest satisfaction, and operational matters to the Wyndham Defendants' corporate offices in New Jersey.

g.  The rules and policies that the Wyndham Defendants adopted required each Franchisee Defendant to report information to their headquarters in New Jersey, including information about all incidents involving safety, security, public relations, or serious injury to persons or property that occur at, or involve, the Subject Days Inn locations, including those involving sex trafficking victims like Jane Doe (R.N.H.).

h.  Each Franchisee Defendant had an ongoing obligation to participate in centralized programs operated by the Wyndham Defendants from their principal place of business in New Jersey.

i.  Each Franchisee Defendant utilized centralized customer feedback and complaint resolution system managed by the Wyndham Defendants from New Jersey, and the Wyndham Defendants and each Franchisee Defendant coordinated efforts to analyze and respond to guest feedback.

j.  Each Franchisee Defendants' employees received training and operational guidelines from the Wyndham Defendants, with key training materials being developed and distributed from New Jersey, particularly in the areas of safety and anti-trafficking protocols. Upon information and belief, each Franchisee Defendant was required to attend training in New Jersey.

k.  Reservation information for rooms at the Subject Days Inn locations passed through a system operated and managed by the Wyndham Defendants from their principal place of business in New Jersey.

l.  Payment information for rooms at the Subject Days Inn locations passed through a system operated and managed by the Wyndham Defendants in New Jersey.

m.  The benefit that each Franchisee Defendant received from room rentals was governed by a New Jersey franchising agreement.

n.  Each Franchisee Defendant agreed to make all payments due under the franchising agreement at the Wyndham Defendants' principal place of business in New Jersey.

7

o. Each Franchisee Defendant's operation of the Subject Days Inn locations was controlled and/or influenced by many policies set and enforced by the Wyndham Defendants from their principal place of business in New Jersey.

p. Each Franchisee Defendant was required to purchase insurance for the New Jersey-based Wyndham entities related to operation of the Subject Days Inn locations.

25. Upon information and belief, each Franchisee Defendant contractually consented to jurisdiction in the District of New Jersey.

## FACTS

**I.    Jane Doe (R.N.H.) is a Survivor of Unlawful Sex Trafficking at the Hotels Owned, Operated, Managed, and Controlled by Defendants.**

1. Jane Doe (R.N.H.) was trafficked through force, fraud and coercion by her trafficker to engage in numerous commercial sex acts. Jane Doe (R.N.H.) met a man who pretended to be romantically interested in Jane Doe. After grooming Jane Doe and gaining her trust, he asked her to move in with him. As soon as Jane Doe (R.N.H.) moved in with him, He began posting her online and forced her into trafficking for his financial benefit. Jane Doe's trafficker used physical abuse and threats to force her to engage in commercial sex until the end of 2016 when she was finally able to escape.

2. At various times between September 2015 to December 2015, Jane Doe (R.N.H.) was continuously and unlawfully trafficked at the Days Inn located at 10801 East Freeway, Houston, TX 77029 ("Days Inn East"). Jane Doe (R.N.H.) was trafficked through force and coercion by her trafficker and required to engage in numerous commercial sex acts for his financial benefit.

3. At various times between September 2015 to June 2016, Jane Doe (R.N.H.) was continuously and unlawfully trafficked at the Days Inn located at 11002 Northwest Freeway, Houston, TX 77092 ("Days Inn Northwest"). Jane Doe (R.N.H.) was trafficked through force

and coercion by her trafficker and required to engage in numerous commercial sex acts for his financial benefit.

4.      At various times between November 2014 to October 2016, Jane Doe (R.N.H.) was continuously and unlawfully trafficked at the Days Inn located at 10137 North Freeway, Houston, TX 77038 ("Days Inn North"). Jane Doe (R.N.H.) was trafficked through force and coercion by her trafficker and required to engage in numerous commercial sex acts for his financial benefit.

5.      Jane Doe (R.N.H.)'s sexual exploitation repeatedly occurred in rooms of the above Days Inn locations (collectively "Subject Days Inn locations") and was facilitated by the Wyndham Defendants and Franchisee Defendants.

6.      During the period that Jane Doe (R.N.H.) was trafficked at the Subject Days Inn locations, there were obvious signs of the activity associated with her trafficking. Throughout this period, Jane Doe (R.N.H.) was under the control of the same trafficker. This trafficker used a consistent *modus operandi* while trafficking Jane Doe (R.N.H.) and other victims. This trafficker imposed strict rules on Jane Doe (R.N.H.) and other victims and followed patterns consistent with how sex traffickers typically operate in hotels. Thus, the trafficking activity at each of the Subject Days Inn locations resulted in obvious and recurring signs that matched "red flags" of sex trafficking recognized by the hotel industry and each of the Defendants.

7.      From September 2015 through December 2015, Jane Doe (R.N.H.) was trafficked an incalculable number of times at the Days Inn East.

8.      There were obvious signs that Jane Doe (R.N.H.) was being trafficked at the Days Inn East such that the Wyndham Defendants and Days Inn East Franchisee knew or, through the

exercise of reasonable diligence should have known, that they were participating in a venture causing her sexual exploitation.

9. Some of the obvious signs of Jane Doe (R.N.H.)'s trafficking at the Days Inn East included the fact that hotel rooms would be paid for in cash, Jane Doe's trafficker would be present with Jane Doe at check in. Housekeeping constantly brought extra towels and would frequently change the sheets to the bed. When housekeeping was in the room they would see excessive condoms in the trash. There was constant heavy foot traffic in and out of her room involving men who were not hotel guests. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

10. At relevant times, Days Inn East Franchisee owned, operated, and managed the Days Inn East and employed the staff at the Days Inn East through the franchising system of the Wyndham Defendants.

11. At all relevant times, the Wyndham Defendants were directly involved in the relevant operations of the Days Inn East and exercised systemic control over Days Inn East Franchisee with respect to operation of the Days Inn East such that the Days Inn East Franchisee were the Wyndham Defendants' actual agents for operation of the Days Inn East. The Wyndham Defendants also retained control over aspects of the operations of Days Inn East directly related to the claims of Jane Doe (R.N.H.).

12. From September 2015 through June 2016, Jane Doe (R.N.H.) was trafficked an incalculable number of times at the Days Inn Northwest.

13. There were obvious signs that Jane Doe (R.N.H.) was being trafficked at the Days Inn Northwest such that the Wyndham Defendants and Franchisee Defendant knew or, through

the exercise of reasonable diligence should have known, that they were participating in a venture causing her sexual exploitation.

14.    Some of the obvious signs of Jane Doe (R.N.H.)'s trafficking at the Days Inn Northwest included the fact that hotel rooms would be paid for in cash, Jane Doe's trafficker would be present with Jane Doe at check in. Jane Doe would wait near by the front desk for johns. Hotel staff made several comments towards Jane Doe that they knew how she was making money. Some Hotel staff even tried to illicit sex from Jane Doe.  Housekeeping constantly brought extra towels and would frequently change the sheets to the bed while Jane Doe and her trafficker were in the room. When housekeeping was in the room they would see excessive condoms in the trash. There was constant heavy foot traffic in and out of her room involving men who were not hotel guests.  These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

15.    At relevant times, Days Inn Northwest Franchisee owned, operated, and managed the Days Inn Northwest and employed the staff at the Days Inn Northwest through the franchising system of the Wyndham Defendants.

16.    At all relevant times, the Wyndham Defendants were directly involved in the relevant operations of the Days Inn Northwest and exercised systemic control over Days Inn Northwest Franchisee with respect to operation of the Days Inn Northwest such that the Days Inn Northwest Franchisee were the Wyndham Defendants' actual agents for operation of the Days Inn Northwest. The Wyndham Defendants also retained control over aspects of the operations of Days Inn Northwest directly related to the claims of Jane Doe (R.N.H.).

17.    From November 2014 through October 2016, Jane Doe (R.N.H.) was trafficked an incalculable number of times at the Days Inn North.

18.     There were obvious signs that Jane Doe (R.N.H.) was being trafficked at the Days Inn North such that the Wyndham Defendants and Franchisee Defendant knew or, through the exercise of reasonable diligence should have known, that they were participating in a venture causing her sexual exploitation.

19.     Some of the obvious signs of Jane Doe (R.N.H.)'s trafficking at the Days Inn North included the fact that hotel rooms would be paid for in cash, Jane Doe's trafficker would be present with Jane Doe at check in. Jane Doe and her trafficker booked two rooms at the same time and the staff knew they would use one room for johns and one room for them to sleep in. Housekeeping constantly brought extra towels and would frequently change the sheets to the bed while Jane Doe and her trafficker were in the room. When housekeeping was in the room they would see excessive condoms in the trash. There was constant heavy foot traffic in and out of her room involving men who were not hotel guests.  These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

20.     At relevant times, Days Inn North Franchisee owned, operated, and managed the Days Inn North and employed the staff at the Days Inn North through the franchising system of the Wyndham Defendants.

21.     At all relevant times, the Wyndham Defendants were directly involved in the relevant operations of the Days Inn North and exercised systemic control over Days Inn North Franchisee with respect to operation of the Days Inn North such that the Days Inn North Franchisee were the Wyndham Defendants' actual agents for operation of the Days Inn North. The Wyndham Defendants also retained control over aspects of the operations of Days Inn North directly related to the claims of Jane Doe (R.N.H.).

22.     The trafficker of Jane Doe (R.N.H.) and other sex traffickers frequently used Wyndham branded hotels for sex trafficking with approval, acquiescence, and/or implicit support of Defendants and their employees and agents, including the staff of the Days Inn locations named herein.

## II.    The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.

23.     The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what Wyndham Defendants knew or should have known regarding the trafficking at their hotel properties, the specific trafficking activity that resulted in the trafficking of Jane Doe (R.N.H.) was pervasive and apparent at the Days Inn locations named herein.

24.     Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[5] For years, sex traffickers have been able to reap their profits with little risk when attempting to operate within hotels.[6] In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[7] Hotels have been found to account for over 90% of the commercial exploitation of children.[8]

---

[5] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune (April 2019), https://fortune.com/2019/04/14/human-sex-trafficking-us-slavery/ (citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council). "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*

[6] *See Human Trafficking in the Hotel Industry*, Polaris Project (Feb. 10, 2016), https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; *see also* Eleanor Goldberg, *You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic*, Huffington Post (June 2016), http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victimslife_u s_57714091e4b0f168323a1ed7.

[7] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hotel Industry*, Cornell Hotel Report (Oct. 2015), https://scholarship.sha.cornell.edu/cgi/viewcontent.cgi?article=1222&context=chrpubs.

[8] *See* Erika R. George and Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery*, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013).

25.     Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.[9]

26.     Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[10] This resulted in the development of "red flags" of sex trafficking. Law enforcement agencies and other organizations with subject-matter expertise identified specific indicators of the presence of sex trafficking at a hotel. The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel. These recurring indicators are known as "red flags" of sex trafficking.

27.     Recognized "red flags" of sex trafficking that are considered general indicators of trafficking that can be observed by staff throughout a hotel[11] include:

_____

[9] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *Red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .
[10] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023);National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, *Red Flags for Hotel & Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, *Human Trafficking Red Flags*, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).
[11] *See id.*

14

- individuals who appear to be with a significantly older "boyfriend" or in the company of much older males;
- a group of girls who appears to be traveling with an older female or male;
- a group with similar tattoos, which can indicate "branding" by a trafficker;
- individuals showing fear, anxiety, tension, submissiveness and/or nervousness;
- individuals who seem disoriented;
- individuals showing signs of physical abuse;
- individuals showing signs of restrain or confinement;
- individuals showing signs of malnourishment, poor hygiene, fatigue, or sleep deprivation;
- individuals with signs of untreated illness or injuries;
- individuals who appear to lack freedom of movement;
- individuals who are being constantly monitored and/or escorted around the hotel;
- individuals who avoid eye contact;
- individuals who avoid interactions with others;
- individuals who are not in possessions of their own identification;
- individuals who have few or no personal possessions;
- individuals who dress provocatively;
- a high volume of men who are not registered guests entering and exiting a room; and
- individuals who wait in common areas while other men frequent the room.

28. Recognized "red flags" of sex trafficking that can be detected by front-desk staff and hotel security[12] include:

- patrons appeared distressed at check-in;
- the same person reserving multiple rooms;
- rooms paid for with cash or prepaid cards;
- rooms are paid for one day at a time;
- requests for isolated rooms or rooms close to an exit;
- use of hotel computers for adult oriented or sexually explicit websites;
- patrons not forthcoming about identifying information when registering;
- individuals checking in but then leaving a room only infrequently, not at all, or at odd hours;
- individuals lack identification;
- car in the parking lot is parked so license plate is not visible;
- individual present who avoids eye contact, does not communicate, and is accompanied by someone else who appears to speak for them; and
- individual appears to be giving scripted responses.

---

[12] *See id.*

15

29. Recognized "red flags" of sex trafficking that can be detected by housekeeping, maintenance, and room service staff[13] include:

- constant use of the "Do Not Disturb" sign;
- requests for housekeeping services (towels, linens, etc.) but denying staff entry into the room;
- refusal of cleaning services for multiple days;
- excessive amounts of cash in a room;
- presence of multiple computers, cell phones, pagers, or other technology;
- the same person reserving multiple rooms;
- individuals leaving the room infrequently, not at all, or at unusual hours;
- individuals loitering in hallways or appearing to monitor a room;
- excessive alcohol in a room;
- illegal drugs in a room;
- evidence of pornography;
- excessive number of people staying in a room;
- guests with few or no personal possessions in room;
- provocative clothing and shoes;
- constant flow of men into a room at all hours; and excessive amounts of sex paraphernalia in rooms.

30. The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Toolkits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[14] From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

31. The organizations who developed these "red flags," then educated and trained the hotel industry about them. For example, the United States Department of Homeland Security's Blue Campaign initiative issued specific guidance to the United States hotel industry through a "Hospitality Toolkit" describing human trafficking warning signs that could be detected by various categories of hotel staff. [15]

---

[13] *See id.*
[14] Department of Homeland Security, *Blue Campaign Toolkit*,
https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.
[15] / Department of Homeland Security, Blue Campaign Toolkit,
https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.;

32.     Before Jane Doe (R.N.H.)'s trafficking at the Subject Days Inn locations, each Defendant was educated and trained on these "red flags" of sex trafficking. The organizations that developed these "red flags" identified them as indicators specific to sex trafficking in a hotel environment. At all relevant times, each Defendant acknowledged and recognized these "red flags" specifically as signs of sex trafficking and instructed and trained their staff to identify and investigate them as signs of sex trafficking when observed in the hotel.

33.     The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion.[16] It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

34.     The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants may attempt to draw a distinction between commercial sex or prostitution and sex trafficking, but they have long understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[17]

35.     All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and

---

www.doj.state.wi.us/sites/default/files/ocvs/human%20trafficking/Hospitality%20Toolkit%20-%20English%20-%2 0Wisconsin%20AG%20Office%281%29.pdf

[16] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.

[17] *Id.*

17

enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

36.     There were also well-established practices for hotels to avoid the facilitation of sex trafficking. For example, End Child Prostitution and Trafficking ("ECPAT-USA") has identified hotel-specific best practices for preventing sex trafficking, such as (1) not permitting cash payments; (2) requiring vehicle information and photo id at check-in; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly and blocking websites frequently used to advertise commercial sex on hotel Wi-Fi; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number; and (8) developing a protocol for response to indicia of trafficking activity.[18]

37.     The most effective weapon against sexual exploitation and human trafficking is education and training.[19]  As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[20]

38.     This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more

---

[18]https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/5cd329e8a4222f20baf5378b/1557342696892/ECPAT-USA_AntiTraffickingHotelChecklist.pdf
[19] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).
[20] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.

willing to report it – than those who have not been trained.[21]  In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

39.    Given the prevalence of sex trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers without taking necessary steps to identify and prevent trafficking in its hotels is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

40.    Each of the Wyndham Defendants and Franchisee Defendants had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

41.    Unfortunately for Jane Doe (R.N.H.), the Wyndham Defendants and Franchisee Defendants have failed, at all levels, to take appropriate action in response to their knowledge of widespread and ongoing human trafficking in their hotels. Instead, they have continued financially benefiting by providing venues for the sexual exploitation of victims like Jane Doe (R.N.H.).

**III.    Sex Trafficking Has Long Been Prevalent at Defendants' Hotel Properties, and Defendants Have Known About It.**

42.    Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Each of the Defendants has known, since well

---

[21] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

before Jane Doe (R.N.H.)'s trafficking, that sex trafficking was ongoing and widespread at Wyndham branded properties including the properties where Jane Doe (R.N.H.) was trafficked.

### A. Sex Trafficking at Wyndham Branded Hotels was well Known by Wyndham Defendants.

43.     Upon information and belief, each of the Defendants monitored criminal activity occurring at Wyndham branded hotels and were aware of activity indicating commercial sex, sex trafficking and/or related crimes occurring at those branded hotels, including the specific hotel properties where Jane Doe (R.N.H.) was trafficked.

44.     Upon information and belief, at all relevant times Wyndham has adopted a centralized approach to trafficking-related issues at all its branded properties. Wyndham's public statements confirm that it knew sex trafficking was a problem at its hotels and that it retained control over the response of its branded hotels to sex trafficking. Wyndham has recognized it has a "critical role in increasing awareness and prevention" of sex trafficking in its hotels.[22] It has publicly claimed to be taking steps to avoid facilitating sex trafficking in its hotels since at least 2011.[23] However, Wyndham has refused to publish reports to show its progress on the EPCAT goals to combat sex trafficking in hotels.[24]

45.     Unfortunately, while Wyndham's statements reflect actual knowledge of the problem of sex trafficking, they reflect only a public relations strategy rather than a genuine commitment to stop facilitating trafficking. Emails among company executives reflect a hesitance to commit to meaningful anti-trafficking measures and a desire to avoid negative publicity without any significant burden.[25]

---

[22] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/
[23] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/
[24] https://thecode.my.salesforce-sites.com/apex/MemberProfilenew?id=0019000000GxgPrAAJ&year=2023
[25] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/ ("Scott McLester, Wyndham's former general counsel and chief compliance officer, wrote in an e-mail to the company's then C.E.O., Stephen Holmes, 'Even though we have been hesitant to commit to everything the [EPCAT] Code was asking for, the issue is not going away and it's starting to impact commercial relationships.' McLester added that the

46.    The problem of sex trafficking at Wyndham branded properties was sufficiently well known that, in 2011, there was a public petition with thousands of signatures to stop Wyndham hotels from supporting child sex exploitation at Wyndham properties. Although the Wyndham brand publicly committed to take steps to stop facilitating trafficking, this promise proved empty; the Wyndham brand has been named a "major contributor to sexual exploitation" and part of the "dirty dozen list" by the National Center on Sexual Exploitation.[26]

47.    In the past twenty years, Wyndham-branded properties have been mentioned in at least two hundred criminal trafficking cases filed by the federal government.[27]

48.    Information that has become public through news stories establishes the entrenched and pervasive nature of Wyndham hotels' role in providing a venue where sex trafficking has continued unabated for years. Upon information and belief, Wyndham Defendants and Franchisee Defendants monitored news stories and online reviews for indicia of criminal activity, including sex trafficking. Examples of news stories confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at Wyndham branded hotels include:

- In 2010, a man was arrested on human trafficking charges, accused of forcing teens into prostitution at a Days Inn."[28]

- June 2011, a woman was sentenced to 9 years in prison for the sex trafficking of two 14-year-old girls. The girls were forced to work at the Days Inn in Hartford, Connecticut.[29]

---

organization's 'concern about being 'bullied' into signing the Code is outweighed by the relative harmlessness of the Code itself.'")

[26] https://endsexualexploitation.org/wyndham/

[27] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/

[28] *Man arrested in Metairie on human trafficking charges; accused of forcing North Carolina teens into prostitution*, NOLA.com (Jul 20, 2010),
Man arrested in Metairie on human trafficking charges; accused of forcing North Carolina teens into prostitution | Crime/Police | nola.com

[29] *East Hartford Woman Sentenced to 9 Years In Prison for Sex Trafficking Of Two 14-Year-Old Girls*, Hartford Courant (June 24, 2011),
https://www.courant.com/2011/06/24/east-hartford-woman-sentenced-to-9-years-in-prison-for-sex-trafficking-of-two-14-year-old-girls/.

- In 2012, federal officials caught and arrested a man alleged to have trafficked a 14-year-old girl at a Florida Days Inn.[30]

- In 2012, the first successful prosecution of a human trafficking case in Wisconsin occurred after a man trafficking a woman at a Days Inn in Wausau, Wisconsin.[31]

- In October 2012, a woman was arrested for prostitution an Ohio Days Inn. This arrest came after a 2011 prostitution sting operation that netted six arrests.[32]

- A Days Inn owner in Pennsylvania was forced to pay 24 million dollars to teenage victims of sex trafficking who were exploited at the hotel in 2012 and 2013.[33]

- Three people were arrested in July 2014 in Fayetteville on human trafficking charges after holding a woman captive at a Days Inn.[34]

- In July 2014, three people were arrested and accused of kidnapping and torturing a woman for human trafficking out of a Days Inn in Orange County, CA.[35]

- In September 2014, two Nevada residents were arrested on sex trafficking charges. Officers set up surveillance at a Days Inn in Nashville and "it did not take long for officers to observe heavy foot traffic in and out of that hotel room consistent with a prostitution operation."[36]

- In 2015, a man was charged with trafficking teenage girls after being arrested at a Days Inn in Maryland.[37]

- In April 2015, a Philadelphia man was sentenced for sex trafficking minors. The man worked as a security guard at a Days Inn in Philadelphia and "provided

[30] *Federal officials catch, arrest man alleged to have prostituted Jupiter girl, 14*, The Palm Beach Post (March 31, 2012)https://www.palmbeachpost.com/story/news/crime/2012/02/08/federal-officials-catch-arrest-man/7283405007/

[31] Shereen Siewert, *Sex-trafficking cases hard to crack in Wisconsin*, Post Crescent (March 25, 2014), https://www.postcrescent.com/story/news/2014/03/25/sex-trafficking-cases-hard-to-crack-in-wisconsin/6884671/.

[32] https://patch.com/ohio/lakewood-oh/woman-arrested-for-prostitution-at-days-inn

[33] https://northeasttimes.com/2019/04/02/roosevelt-inn-days-inn-named-in-sex-trafficking-lawsuits/

[34] Three arrested on human trafficking charges in NC, Fox8 (July 2, 2014), https://myfox8.com/news/three-arrested-on-human-trafficking-charges-in-nc/.

[35] Jeanne Kuang, Three Accused of Kidnapping, Torturing Woman for Human Trafficking in Orange County, NBC Los Angeles (July 30, 2014), https://www.nbclosangeles.com/news/three-accused-of-brutally-kidnapping-torturing-woman-for-human-trafficking-in-orange-county/65718/.

[36] Las Vegas Man, Woman Jailed on Prostitution Charges, City of Franklin, TN (Sept. 5, 2014), https://www.franklintn.gov/Home/Components/News/News/2563/.

[37] https://www.heraldmailmedia.com/story/news/local/2015/07/01/hagerstown-man-charged-with-trafficking-of-two-teenage-girls/45202521/

protection and assistance to sex traffickers operating at the motel in exchange for a daily fee."[38]

- In June 2015, two Brooklyn men charged with sex trafficking allegedly forced a teenage girl into prostitution from a Long Island City Days Inn.[39]

- In 2015, Frederick County sheriff's deputies in Maryland charged a man with human trafficking after two teenage girls were forced into prostitution at a Days Inn.[40]

- In 2015, two Brooklyn men charged with sex trafficking, forcing a teenage girl into prostitution from a Long Island City Days Inn. The general manager at the Days Inn declined to comment.[41]

- In 2016, a man was arrested and charged with pimping and sex trafficking a 16-year-old girl who was being held against her will at a Days Inn in Athens, Georgia and forced to engage in sex in exchange for money.[42]

- In 2016, Montgomery County Police detectives arrested a man for human trafficking, forcing a 15-year-old girl to have sex with around 290 men for money for three months at the Days Inn in Silver Spring, Maryland.[43]

- In 2016, two people in Columbia, South Carolina were charged with sex trafficking after forcing four underage victims between the ages of 15 and 17, to perform sex acts on men for money at a Days Inn.[44]

- In 2016, two were charged with trafficking women out of two rooms at the Days Inn on Tollgate Boulevard in Naples, Florida[45]

---

[38] Philadelphia Man Sentenced for Sex Trafficking Conspiracy, U.S. Attorney's Office (April 9, 2015), https://www.fbi.gov/contact-us/field-offices/philadelphia/news/press-releases/philadelphia-man-sentenced-for-sex-trafficking-conspiracy.

[39] Jackie Strawbridge, *Cuffed Brooklyn Men Allegedly Pimped At LIC Hotel*, licpost (June 9, 2015), https://licpost.com/cuffed-brooklyn-men-allegedly-pimped-at-lic-hotel.

[40] https://www.heraldmailmedia.com/story/news/local/2015/07/01/hagerstown-man-charged-with-trafficking-of-two-teenage-girls/45202521/

[41] https://licpost.com/cuffed-brooklyn-men-allegedly-pimped-at-lic-hotel

[42] https://roughdraftatlanta.com/2016/03/24/sandy-springs-man-arrested-athens-ga-sex-trafficking/

[43] https://www.wusa9.com/article/news/local/silver-spring/human-trafficking-at-silver-spring-hotel/65-293726257

[44] https://www.wistv.com/story/33818235/two-charged-in-sex-trafficking-case-after-incident-involving-teens-at-columbia-hotel

[45] https://www.fox4now.com/news/two-men-charged-with-human-trafficking-in-collier-county

23

- In 2017, a man in Honesdale, PA was charged with human trafficking after luring a 15-year-old girl from her home and trafficked her out of the Days Inn in Tannersville, PA.[46]

- In 2017, a woman was held against her will and sold for sex at a Days Inn Hotel in Raleigh, North Carolina.[47]

- In 2017, two men in Lubbock, Texas were arrested at the Days Inn in connection with a prostitution investigation.[48]

- In 2017, arrests were made after it was discovered women were being trafficked out of a Days in Inn Tennessee.[49]

49.    These articles are only representative examples. There are many similar articles about sex trafficking and other associated criminal activity at Wyndham branded hotels. Moreover, on information and belief, the Wyndham Defendants are aware of additional significant law enforcement activity related to trafficking at their hotels that was not reported in the media.

50.    Based on information and belief, the Wyndham Defendants and Franchisee Defendants managed and monitored on-line reviews of Wyndham hotel locations. Examples of reviews reflecting indica of sex trafficking and related criminal activity include:

- A Booking.com review from September 29, 2021 states: "Negative: The cops pulled us over after we left the parking lot. They told us that this motel was known fir [sic] drugs and sex rings"[50]

- A Google.com review from 2018 states: "Problem I have is owner. He treats women very poorly and makes his underage children work there. A lot of prostitution that I'm sure owner aware of. I seen him talking to this guy that has checked in 3 different times with 3 different [sic]"[51]

---

[46] https://www.wnep.com/article/news/local/bradford-county/human-trafficker-sentenced-in-wayne-county/523-78c7c7cf-cef1-43ef-ac01-b3a4beb440f4

[47] https://www.wral.com/-no-shortage-of-work-raleigh-police-fight-against-human-trafficking/16453290/

[48] https://www.lubbockonline.com/story/news/crime/2017/01/11/federal-court-lubbock-man-s-sex-trafficking-case-linked-motel-raid/14878756007/

[49] https://www.wgnsradio.com/article/35818/human-trafficking-case-in-murfreesboro

[50] https://www.booking.com/hotel/us/days-inn-clarksville-tn.html

[51] https://www.google.com/travel/hotels/Days%20Inn%20127%20W%20Byers%20Ave.%20New%20Stanton,%20PA%2015672%20google/entity/CgoIiJGz_YeevpIDEAE/prices?g2lb=2502548,2503771,2503781,4258168,4270442,

- A Trip Advisor review from June 20, 2014 states: "I witnessed what seemed to be prostitution in and out of the hotel. A huge party went on "in the hallways" well into the night with full tilt hip hop music. The following morning I experienced a naked woman being attacked in the hallway and had to intervene when not one other hotel security, management came to help."[52]

- A June 2007 Tripadvisor review from a Days Inn in Fresno, CA states "…Which leads me to note the problems with this motel--its location. Because it's close to the 99, and gets a lot of quick travelers up and down the highway, it seems to be the neighborhood to find a prostitute. During our one day stay, we saw at least 4. In the DAYTIME!! And although we weren't bothered by anyone, and the motel itself was quiet, if you've got a family you may want to skip this one."[53]

- A July 2007 Tripadvisor review from a Days Inn in Philadelphia, PA states "This was the worst place I've ever stayed in my life. I've stayed in a lot of Day's Inn that were clean, adequate rooms in a safe neighborhood. As we followed the directions we became apprehensive. When we entered the hotel lobby we knew we had made a mistake when we saw the "bullet proof glass"surrounding the front desk. With our arrival being 4th of July week we felt stuck knowing we could probably not find another room in town at 7 PM. We decided it was better to lock ourselves in a room there than to risk not finding a room elsewhere and having to spend the night in the car. I'll just say that after my one night stay here I'm not sure if I'll ever book Days Inn again! The carpet was soiled. The headboards that were supposed to be bolted to the wall was coming off. We checked out at first light assuming this would be the safest time of day to get out! Prostitutes were hanging around out front and coming in purchasing rooms. Definately not a place for a family!"[54]

- August 2008 Tripadvisor review from a Days Inn in Birmingham, AL states "Saw the website pictures and thought it looked nice and was a good value. So, I booked the room for a week. It was a mistake! It was dirty and

---

[52]4284970,4291517,4306835,4429192,4515404,4597339,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4886082,4886480,4893075,4902277,4905351,4926165,4926489,4931360,4936396,4937897,4940607,47061553&hl=en-US&gl=us&ssta=1&q=Days+Inn+127+W+Byers+Ave.+New+Stanton,+PA+15672+google&grf=EmMKLAgOEigSJnIkKiIKBwjnDxAEGBASBwjnDxAEGBEgADAeQMoCSgcI5w8QARgfCjMJDBIvEi2yASoSKAomCiQweDg4MzRkOTA1ZjM5OTA5YmQ6MHgzMjRmOGYwN2ZhY2M4ODg&rp=EIiRs_2Hnr6SAxCIkbP9h56-kgM4AkAASAHAAQI&ictx=1

[52]https://www.tripadvisor.com/Hotel_Review-g60097-d1571552-Reviews-Days_Inn_Suites_by_Wyndham_Milwaukee-Milwaukee_Wisconsin.html

[53]

https://www.tripadvisor.com/Hotel_Review-g32414-d77021-Reviews-Days_Inn_by_Wyndham_Fresno_Central-Fresno_California.html

[54]

https://www.tripadvisor.com/Hotel_Review-g60795-d96684-Reviews-or20-Days_Inn_by_Wyndham_Philadelphia_Roosevelt_Boulevard-Philadelphia_Pennsylvania.html

had a lot of low life people staying there. Prostitutes, pot heads, and people wandering around all over the place. The pool was a "cess-pool". It stank, and there was a condom wrapper in it. I will NEVER stay there again"[55]

- November 2008 Expedia review from a Days Inn in Nanuet, NY states "The one thing that I will always remember about this hotel was that I had to call the front desk because a very loud and noisey pair of hookers decided to hang out in the hallway next to the exit door (which was unfortunately right near my room) while they waited for a ride to pick them up after their visit to the neighboring hotel room. They were loud and obnoxious after 10 pm while I and my family were trying to sleep. We were on a non-smoking floor and the hookers in the hallway were smoking. When we checked out the next morning we found the hallway littered with their half-eaten pizza slices and crumpled up paper cups. I had to call the front desk to complain about the noise. I don't know if it was a hotel employee or their ride who finally showed up and hustled the call-girls out of the hallway."[56]

- December 2008 Tripadvisor review of a Days Inn in Silver Spring, MD states "This was the worst hotel in my life!" "Both me an my friend are not weedy guys, but we felt unsafe staying there. At around 6pm some black guys kept hovering outside the room, then as it got later some other black guys pulled up in a car outside in the car park and where making lots of noise in there car... then other black guys would go up to the car, and then after a while walk off. Seemed like drug deals where going on in the car park! This is bad because the hotel has absolutely no (ZERO!) security. Members of the public can freely walk in and just go straight to the rooms. It felt very unsafe, so we instantly checked out and made a quick getaway! Later we found a motel 6 which was a little better but at least safer than this hotel. Other people from the area told us that if the locals notice any foreigners then we could be easy targets and they will watch us. Very unsafe. bullet proof glass in the reception, its basically like being in the bronx run down hotel. It seems that its a very cheap hotel, where the criminals, drug dealers, prostitutes use as its cheap. Dangerous for outsiders or foreigners to use. Not recommended at all. Avoid at all costs."[57]

- February 2009 Tripadvisor review of a Days Inn in Miami, FL states "…got to the hotel, which is in a seedy neighborhood. Walked into the

[55] https://www.tripadvisor.com/Hotel_Review-g30375-d73343-Reviews-Days_Inn_by_Wyndham_Birmingham_West-Birmingham_Alabama.html

[56] https://www.expedia.com/Nyack-Hotels-Days-Inn-By-Wyndham-Nanuet-Spring-Valley.h172075.Hotel-Reviews

[57] https://www.tripadvisor.co.za/Hotel_Review-g41378-d84007-Reviews-or260-Days_Inn_by_Wyndham_Silver_Spring-Silver_Spring_Montgomery_County_Maryland.html

lobby and there were six people in front of us trying to check in. There was a HOOKER working in the lobby. There was one person working plus a security guard. It was taking the receptionist 15 minutes to check in one person. We realized it would be an hour and a half to check in, we'd only get to sleep for 2.5 hours, so we got BACK in the shuttle and slept on the floor of the airport, it was that scary. Don't be fooled."[58]

● July 2010 Tripadvisor review of a Days Inn in Springfield, MO states "Hotel Staff was very friendly, but when we first went into the room there was trash under the bedskirt and a used condom laying by the night stand…Worst of all there were prostitutes staying down below us, I had to go notify staff, she comented that she wonder if that was why she was staying here and the day before we came back to the hotel from watching my son play ball and 2 women were being arrested on the stairs going up to our room. There were several homeless people hanging around the hotel for 3 of the days. I have stayed in Days Inn before and they were nice but I did not feel safe and the experience was bad so I am not sure I will stay again…"[59]

● August 2010 review from Days Inn in Norfolk, VA states "…There were many people drinking on the upper floor. We were told by a passerby that their son was offered services by prostitutes while on the premises. We left right away. Front desk staff said this hotel is safe but front desk staff will note even allow people to walk into the front desk lobby but rather communicate with people through a little hole on a confined space area about 4 x 7 room prior to entering the front desk lobby giving people a false sense of security. There were many people drinking on the upper floor and loitering. No security staff to enforce any rules. My family was frightened to stay at this inn."[60] The manager of this hotel responded to it on November 19, 2010.

● September 2010 review of a Days Inn in Milwaukee, WI states "…got back about midnight to find a pair of gentlemen bleeding in the main lobby, i later found out that they were there for a bachelor party and had found a couple "working girls" who took them out and then drugged and beat them, and the their pimp did some stuff i dont even want to repeat, regardless to say, i didnt spend the night, i left at about 3 am, checked into a hotel and absolutely would not recomment this hotel, staff and hotel are

---

[58] https://www.tripadvisor.com/Hotel_Review-g34443-d87080-Reviews-Days_Inn_by_Wyndham_Miami_Airport_North-Miami_Springs_Florida.html

[59] https://www.tripadvisor.com/Hotel_Review-g44926-d243908-Reviews-Days_Inn_Suites_by_Wyndham_Springfield_on_I_44-Springfield_Missouri.html

[60] https://www.tripadvisor.com/Hotel_Review-g58026-d110777-Reviews-Days_Inn_by_Wyndham_Norfolk_Military_Circle-Norfolk_Virginia.html

nice enough. but the manager and location are just not worth dealing with."[61]

- June 2011 Expedia review of a Days Inn in San Jose, CA states "NOT SAFE PLACE TO STAY OR BRING YOUR FAMILY. Nothing was clean, swimming pool was not usable, there were blood stains on the sheets, no customer service.~~Worst of all, there were drug deals there all the time as well I was propositioned for sex as someone thought I "worked there" Please do not stay here if you want to feel safe"[62]

- January 2012 review from a Days Inn in Lawndale, CA states "… it felt super unsafe lie kinda place that hookers, pimps, gens, & drug dealers frequent. … I would never stay here again. this place is a motel! worth only about $25 a night. its no good unless u just need four walls and bed to sleep in for a night."[63]

- March 2012 review from a Days Inn in New Stanton, PA states "…Sketchy men are inside their truck smoking and hanging out in the parking lot. Men start ogling me and eying me in a creepy, sketchy way and my coach and her husband (both are cops) make a comment about a young woman who is scantly clad and walking with a man in his sixties arm in arm. The son makes a comment that a business transaction was going on and this was a prostitute and a john!" "So, I know that they got rid of my room, because they would rather charge a desperate pervert a higher rate so that he could pay for sex, then an athlete with a lower rate. I argue with the two people at the front desk and get into a shouting match and then five sketchy men stand right near the front desk staring there even after he said that the hotel was booked full…"[64]

- June 2012 review from Das Inn in Atlantic City, NJ states "…when I came back to my hotel I was greeted by to atlantic city prostitutes walking out of the lobby with the european looking fellow. At the lobby the hotel has a $10 per guest policy I suppose as a way of making commissions. Lol. Uuuugh.for the price I paid I should have expected as much and not been as naive but I won't be making that mistake again."[65]

[61] https://www.tripadvisor.com/Hotel_Review-g60097-d1571552-Reviews-Days_Inn_Suites_by_Wyndham_Milwaukee-Milwaukee_Wisconsin.html

[62] https://www.expedia.com/San-Jose-Hotels-Days-Inn-By-Wyndham-San-Jose.h18108.Hotel-Reviews

[63] https://www.tripadvisor.ca/Hotel_Review-g32612-d84227-Reviews-Days_Inn_by_Wyndham_Los_Angeles_Lax_Redondo_ManhattanBeach-Lawndale_California.html

[64] https://www.yelp.com/biz/days-inn-by-wyndham-new-stanton-pa-new-stanton

[65] https://www.yelp.com/biz/days-inn-by-wyndham-atlantic-city-oceanfront-boardwalk-atlantic-city

- October 2012 Yelp review of a Days Inn in Sarasota, FL states "Great hotel - if you enjoy being propositioned by prostitutes. Skid row's "finest." A real DUMP."[66]

- January 2013 review from Days Inn in Copiague, NY states "I would not wish this place on my worst enemy. The room smelled like a dead body and they tried to cover it up with Lysol. I let them know that I tried to air the room out for 20 minutes and it did not help. They moved me to the room next door and it was the same thing.
There were all kinds of ghetto trash hanging around my car when I was leaving and the place seemed like a party/hooker hotel based on the people hanging around there."[67]

- January 2013 review of Days Inn in Miami, FL states "Our television didn't work, the walls and tub had stains all over them, and there were hookers and their pimp hanging out waiting for johns on the top floor of the outside rooms overlooking the parking lot. When we complained it was obvious that some of the staff obviously knew what was going on with the prostitution. However the staff we dealt with did try to accomodate us by giving us another room on the inside of the hotel, but it was still filthy."[68] A guest relations manager responded to this review on February 4, 2013.

- March 2013 review of a Days Inn in Monroeville, PA states "jenny calderlore (manager) u are failing at making this hotel a success ur neglect and lack of responsibility has turnd me and buisness partners off we will never use this shack again we areas more then the twobit nite people (prostitutes and drug abusers) that use ur facility i will never consider ur hotel again!"[69]

- April 2013 review of a Days Inn in Alexandria, VA states "…Everything is true about the drug activity, prostitutes, across the street is section 8 housing with loud music and lots of "traffic" to one house in particular…Safety is definitely a concern.. I parked my car one night after partying in DC and a bum knocked on my window asking for change. The police have come a few nights driving through the area asking is

---

[66] https://www.yelp.com/biz/days-inn-by-wyndham-sarasota-bay-sarasota

[67] https://www.tripadvisor.ca/Hotel_Review-g47533-d1176402-Reviews-Days_Inn_by_Wyndham_Long_Island_Copiague-Copiague_Long_Island_New_York.html

[68] https://www.tripadvisor.com/Hotel_Review-g34443-d87080-Reviews-Days_Inn_by_Wyndham_Miami_Airport_North-Miami_Springs_Florida.html

[69]

29

everything okay. One officer referred to the area as the "problem area".["][70] A guest relations manager responded to this review on April 7, 2013.

- May 2013 review of a Days Inn in Kent, WA states "…During this wait is when we witnessed the worrying stuff. We got the impression that most of the other motel guests lived there. There were guests in and out asking the desk if they had messages who either looked really disheveled or like a prostitute. Some of them knew each other. There was one woman checking in. The employee at the counter told her that if she had any "guests" she would be asked to leave..clearly there was a history. I wrote all this off to my imagination..until a police officer came in. He talked to the staff about their ongoing problems with prostitution and drugs and was offering his help and advice..the staff told him about the people living in their van and car in the parking lot. There were three police cruisers in the parking lot for awhile after that."[71]

- July 2013 review of a Days Inn in Louisville, KY states "I could not believe how bad this place was. The room was nasty, I was afraid to put my 8 month old down! The tub was stained and there were "hairs" in the tub. Not only was the room bad but so was the area..we had prostitutes working from the sidewalk outside our door! We checked out and went to another hotel down the road."[72] The hotel manager responded to this review on July 12, 2013.

- July 2013 review from Days Inn in Corpus Christi, TX states "…I honestly felt that some sort of prostitution was taking place on premises. I can think of no other explanation for the constant activity between midnight and 5:00 a.m. No iron in the room. Hallways smelled like the place had been in a flood. after the first night my son's legs boke out in a rash. The worst hotel experience ive ever had. Definitely not worth $476."[73]

- September 2013 review from a Days Inn in Dallas, TX states "…The hotel is used mainly by prostitutes and drug dealers. It was a last minute decision on my part, due to a change in my work plans. At least I didn't find bed bugs... Wifi only worked in the lobby, false advertising on the

---

[70] https://www.tripadvisor.co/Hotel_Review-g30226-d83887-Reviews-Days_Inn_by_Wyndham_Alexandria-Alexandria_Virginia.html

[71] https://www.tripadvisor.com/Hotel_Review-g58537-d216846-Reviews-Quality_Inn_Kent-Kent_Washington.html

[72] https://www.tripadvisor.com/Hotel_Review-g39604-d295278-Reviews-Days_Inn_by_Wyndham_Louisville_Airport_Fair_and_Expo_Center-Louisville_Kentucky.html

[73] https://www.expedia.com/Corpus-Christi-Hotels-Days-Inn-Suites-By-Wyndham-Corpus-Christi-Central.h43249.Hotel-Reviews

hotel's part.... Employees there (front desk clerk and housekeeping) were very unfriendly and not helpful. overall, the worst experience with a hotel, ever. I'm upset that I paid for such crappy service and room."[74] A guest relations manager responded to this review on September 24, 2013.

- January 2014 review from a Days Inn in Beaumont, TX states "Let's see, moldy smell in room? Check. Mildew around tub? Check. Hastily painted over black mold on the wall? Check. Look on my wife's face when a hooker knocks on the door at 2 AM.? Priceless!"[75]

- February 2014 review from a Days Inn in Saint Paul, MN states "…However, when my companions and myself (three women total) went down to the bar for a drink we were propositioned.I had security remove this man. But within a short period of time he was back again harssing us. I did find out from a family member whom we were visitng that this hotel was busted for a prostitution ring. Well, that was not on the description of the hotel that I read! Had I known this we would have stayed elsewhere."[76]

- April 2014 review of a Days Inn in North Charleston, SC states "…We will NEVER stay here again. The first two nights the people next door argued and yelled half the night. Think a hooker and her pimp because people kept coming in and out all night, ridiculous."[77]

- May 2014 review of a Days Inn in Lanham, MD states "This hotel seems highly trafficked by young adults and/or those using said hotel rooms for sex/prostitution purposes. There was also a lot of screaming and cursing amongst the guests staying at hotel, with very little intervention from night staff."[78]

- July 2014 review of a Days Inn in Columbia, SC states "This place is a dump!! Not a safe place to stay with your family. Hooker's walking around, high speed chase, and drug dealing in front of my room!!! Do Not waste your money!!!"[79]

---

[74] https://www.tripadvisor.co.nz/Hotel_Review-g55711-d109479-r368180294-Days_Inn_Suites_by_Wyndham_Dallas-Dallas_Texas.html

[75] https://www.yelp.com/biz/days-inn-by-wyndham-beaumont-beaumont

[76] https://www.expedia.com/Minneapolis-St-Paul-Hotels-Quality-Inn-St-Paul-Minneapolis-Midway.h20646.Hotel-Reviews

[77] https://www.expedia.com/Charleston-Hotels-Days-Inn-Suites-By-Wyndham-Charleston-Airport-West.h11774.Hotel-Reviews

[78] https://www.tripadvisor.com/Hotel_Review-g41222-d217008-Reviews-Days_Inn_by_Wyndham_Lanham_Washington_D_C-Lanham_Maryland.html

[79] https://www.yelp.com/biz/days-inn-and-suites-by-wyndham-se-columbia-ft-jackson-columbia

- July 2014 review of a Days Inn in Savannah, GA states "…Friday night I get woke up by drunk guest in the court yard. 1 am . I go to get something from the car there is 2 prostitutes offering sex for money in the drive way to a group of men getting drunk in the driveway. I decide to get stuff from the vending machines, I couldn't buy a candy bar but you could by condoms…"[80]

- September 2014 review of a Days Inn in Springfield, MO states "Worse hotel ever the room smelt like dirty feet, drug deal in the parking lot. A hooker trying to get my son to come to her room people knocking at your door all hours of the night. Then they took an $101 for charges and told me the room smelt like cigarettes.I dont smoke. So now I'm fighting with corporate office to get back my $101."[81] The hotel manager responded to this review on October 20, 2014.

- May 2015 review of a Days Inn in Monroe, LA states "…Dirty rough people walking around, 2 cars on flat, women hanging out I am assuming they might be prostitutes. Worst hotel I have ever been to in my life! I come to Monroe 2 times a month and will never ever stay here again. Really thinking of sleeping in my car, this hotel is horrible nasty. Don't book !!!!!!"[82]

- July 2015 review of a Days Inn property in Norfolk, Virginia states: "Hotel used for prostitution."[83] The manager at the Days Inn responded to this review on August 12, 2015.

- October 2015 review of a Days Inn in Albuquerque, NM states: "…there were too many hookers in the parking lot and I presume in the rooms. Made me feel like I was in a high crime area. I would recommend a different area of town. This area made me feel unsafe."[84]

---

[80] https://www.tripadvisor.com/Hotel_Review-g60814-d89795-Reviews-or660-Days_Inn_Suites_by_Wyndham_Savannah_Gateway_I_95_and_204-Savannah_Georgia.html

[81] https://www.tripadvisor.com/Hotel_Review-g44926-d243908-Reviews-Days_Inn_Suites_by_Wyndham_Springfield_on_I_44-Springfield_Missouri.html

[82] https://www.tripadvisor.com/ShowUserReviews-g40319-d141890-r270664327-Days_Inn_By_Wyndham_Monroe_La-Monroe_Louisiana.html

[83] https://www.tripadvisor.com/ShowUserReviews-g58026-d110777-r291262508-Days_Inn_by_Wyndham_Norfolk_Military_Circle-Norfolk_Virginia.html

[84] https://www.tripadvisor.com/ShowUserReviews-g60933-d216969-r319821950-Days_Inn_by_Wyndham_East_Albuquerque-Albuquerque_New_Mexico.html

- A January 2016 review of a Days Inn property in Arlington, Virginia states: "I would rather sleep in my car. I travel a lot and have stayed in literally hundreds of hotels covering a wide price range. I got stuck here because there was literally nowhere else to stay in the area. The parking lot was frequented by "working girls" and, at the time, they had a cop who lives there (to promote safety I guess). It didn't work. The rooms are filthy. I was deeply concerned my car and/or room would be broken into. I slept with a baseball bat (I happened to have one in my car) every night. It was that unsafe…"[85]

- March 2016 review of a Days Inn in Concord, CA states "Highly discourage anyone to stay at this place. Sex workers and johns all through out the night. It's not discreet either..."[86] Hotel Management responded to this review on April 9, 2016.

- August 2016 review of a Days Inn in Palmdale, CA states "RAPIST paradise! full of drug dealers and gang people. NOT safe, stay away!!!!"[87]

- January 2017 review of a Days Inn in Fort Myers, FL states "If I could give negative stars I would. I have stayed here a total of over 200 nights in the past 2 1/2 years and it continues to get worse. Drug deals and prostitution, the infestation of roaches, and the lack of cleanliness of the entire property…"[88] Hotel Owner responded to this review on March 12, 2017.

- February 2017 review of a Days Inn in Concord, CA states "…Also learned this hotel has prostitutes so I'm sure someone was trying to "recruit" girls..."[89]

- August 2017 review of a Days Inn in Sharonville, OH states "…When I got to the room after passing people in the parking lot doing drugs and soliciting prostitution, I walked in to find it was already occupied..".[90]

---

[85] https://www.tripadvisor.com/ShowUserReviews-g30242-d216858-r338148788-Days_Inn_by_Wyndham_Arlington_Washington_DC-Arlington_Virginia.html

[86] https://www.tripadvisor.com/ShowUserReviews-g32243-d80860-r359560171-Days_Inn_by_Wyndham_Concord-Concord_California.html

[87] https://www.yelp.com/not_recommended_reviews/days-inn-and-suites-by-wyndham-sunnyvale-sunnyvale

[88] https://www.tripadvisor.com/Hotel_Review-g32243-d80860-Reviews-Days_Inn_by_Wyndham_Concord-Concord_California.html#REVIEWS

[89] https://www.expedia.com/Minneapolis-St-Paul-Hotels-Super-8-By-Wyndham-Brooklyn-CenterMPLS.h124015.Hotel-Reviews

[90] https://www.tripadvisor.com/ShowUserReviews-g50962-d95112-r511281551-Days_Inn_by_Wyndham_Sharonville-Sharonville_Ohio.html

51.     This sampling of news stories, reviews, and other public information establishes that, at the time Jane Doe (R.N.H.) was trafficked at the Subject Days Inn locations, the Wyndham Defendants knew or should have known that:

    a.   There was widespread and ongoing sex trafficking occurring at Wyndham branded properties;

    b.   Sex trafficking was a brand-wide problem for Wyndham originating from management level decisions at their corporate offices in New Jersey;

    c.   Wyndham franchisees and hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties;

    d.   Wyndham's efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective; and

    e.   Wyndham and its franchisees were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

52.     Despite the mounting evidence that sex trafficking at their properties was ongoing and growing, Wyndham Defendants and each of the Franchisee Defendants chose to earn revenue by continuing conduct that they knew or should have known would facilitate that trafficking.

**B.   The Wyndham Defendants and Franchisees had actual and constructive knowledge of widespread and ongoing sex trafficking at the Subject Days Inn locations.**

53.     Sex trafficking was widespread and pervasive at the Subject Days Inn locations specifically.

54.     The Wyndham Defendants and Franchisee Defendants knew or should have known about the sex trafficking pervasive at their respective Subject Days Inn location based on obvious indicators of this activity.

55.     Internet reviews for the Subject Days Inn locations, which upon information and belief Wyndham Defendants and their respective Days Inn Franchisee Defendants manage and

monitor, show the pervasiveness of sex trafficking before and well after Jane Doe (R.N.H.) was trafficked. For example:

    a.  A 2013 Expedia review of the Days Inn Northwest states: "…I had grown men scarred they would get mugged or harmed staying there. They were approached many times by prostitutes and drug dealers. This was the worst stay and will never ever stay there again or recommend it to anyone."[91]

    b.  A 2013 TripAdvisor review of the Days Inn North states: "…Hookers await you like a Houston barrio valet service when you get out of your car. How nice is that? STD's come with Wi-Fi!!...."[92]

    c.  A 2014 Expedia  review for the Days Inn East states: "The hotel is in the mens club area. Also as soon as we turned on the tv, pornography was on. This area is not for families..."[93]

    d.  A 2014 TripAdvisor review for the Days Inn East states: "…No security on the property, looks like this Days Inn should be a rent by the hour motel. Very bad. I should have stayed the night in my vehicle at least I would have slept and felt safer. This motel doors open to the outside. This motel makes it a great hang out for riffraff."[94]

    e.  A 2014 TripAdvisor review of the Days Inn North states: "…Prostitutes were in and out of hotel. Truck drivers needing a quick nap to get back on road. Homeless people: several families staying at motel. This is not a place that you would "want" to stay, this is a place if you were the last person on earth and this was the only place available then you would want to stay here."[95]

    f.  A 2015 Expedia review of the Days Inn North states: "Apparently I found out too late that this hotel is literally full of prostitutes…"[96]

---

[91] https://www.expedia.com/Houston-Hotels-Days-Inn-By-Wyndham-Houston.h15997.Hotel-Reviews

[92] https://www.tripadvisor.com/Hotel_Review-g56003-d223160-Reviews-Days_Inn_Suites_by_Wyndham_Houston_North_Aldine-Houston_Texas.html

[93] https://www.expedia.com/Houston-Hotels-Days-Inn-By-Wyndham-Houston-East.h901558.Hotel-Information?pwaDialog=summary-reviews-property-summary-1

[94] https://www.tripadvisor.com/Hotel_Review-g56003-d1146180-Reviews-or50-Days_Inn_by_Wyndham_Houston_East-Houston_Texas.html 2014

[95] https://www.tripadvisor.com/Hotel_Review-g56003-d223160-Reviews-Days_Inn_Suites_by_Wyndham_Houston_North_Aldine-Houston_Texas.html

[96] https://www.expedia.co.nz/Houston-Hotels-Days-Inn-Suites-By-Wyndham-Houston-NorthAldine.h805804.Hotel-Reviews

g. A 2015 TripAdvisor review of the Days Inn Northwest states: "First few nights was ok but the last 3 nights they put a prostitute above us and was very loud all hours of night, I complained every morning but nothing was taken care of."[97]

h. A 2017 Expedia review of the Days Inn North states: "Itâ€™s a trap hotel for prostitution."[98]

i. A 2018 Expedia review of the Days Inn Northwest states: "I wasn't really feeling it. I felt like I was waiting on a prostitute to come into my room smh. It had people standing outside the doors, in the parking lot etc…"[99]

j. A 2018 TripAdvisor review of the Days Inn North states: "Guys knocking on the doors to see if a prostitute was in the room. Fights outside the window. Drug paraphernalia in the room."[100]

56.     Defendants knew that a population of traffickers, including Jane Doe (R.N.H.)'s traffickers, repeatedly chose to use their respective Subject Days Inn location for their sex trafficking activity. They selected these hotels because of policies and practices that created a favorable environment for trafficking and because hotel staff turned a blind eye to signs of trafficking. These traffickers followed a repetitive and routine procedure during stays at the Days Inn locations. There were obvious signs of this activity, which were consistent with the well-known "red flags" for sex trafficking in the hospitality industry. As such, Defendants also knew or should have known about the pervasive sex trafficking at their respective Subject Days Inn location based on obvious indicators of this activity.

57.     These traffickers, including (R.N.H.)'s trafficker, operated with little regard for concealment, due to an implicit understanding between Defendants and the traffickers. This

---

[97] https://www.tripadvisor.com/Hotel_Review-g56003-d99014-Reviews-Days_Inn_by_Wyndham_Houston-Houston_Texas.html

[98] https://www.expedia.co.nz/Houston-Hotels-Days-Inn-Suites-By-Wyndham-Houston-NorthAldine.h805804.Hotel-Reviews

[99] https://www.expedia.com/Houston-Hotels-Days-Inn-By-Wyndham-Houston.h15997.Hotel-Reviews

[100] https://www.tripadvisor.com/Hotel_Review-g56003-d223160-Reviews-Days_Inn_Suites_by_Wyndham_Houston_North_Aldine-Houston_Texas.html

understanding enabled the traffickers to operate openly, as they had found a venue where they could conduct their operations without disruption from Defendants.

58.    Upon information and belief, there were other victims being trafficked at the Days Inn locations at the same time as (R.N.H.), and there were obvious signs these victims were being trafficked.

59.    Based upon information and belief, the conduct of Defendants facilitated the trafficking of multiple victims by multiple traffickers at their respective Subject Days Inn locations. Defendants developed a continuous business relationship with these traffickers who operated at the hotels on a routine and repetitive basis.

60.    Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at each of the Subject Days Inn locations prior to Jane Doe (R.N.H.)'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who not registered guests in and out of their room at unusual times, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

61.    All knowledge from the staff at each of the Subject Days Inn locations is imputed to the respective Franchisee, which employed the hotel staff. Thus, each Franchisee knew about the widespread and ongoing trafficking at their respective Days Inn location, including the

37

trafficking of Jane Doe (R.N.H.), through the direct observations of hotel staff, including management-level staff. This knowledge is further imputed to the Wyndham Defendants based on the existence of an actual agency relationship as described below.

62.     In addition to available public sources of information about trafficking and knowledge imputed from the hotel staff and management, each of the Franchisee Defendants learned or should have learned about the obvious signs of widespread trafficking at its hotel, based on non-public sources of information including but not limited to:

   a.   surveillance of the property;

   b.   internal investigations;

   c.   customer complaints;

   d.   monitoring of customer feedback;

   e.   information received from law enforcement;

   f.   and other sources of non-public information available to each Franchisee.

63.     Upon information and belief, the Wyndham Defendants knew or should have known about the widespread trafficking at the Subject Days Inn locations based on the tools they used to monitor and oversee these hotels. The tools they used included:

   a.   The obligation of hotel staff and franchisee to report suspected criminal activity, including sex trafficking, to the Wyndham Defendants;

   b.   The Wyndham Defendants' regular monitoring of online reviews;

   c.   The Wyndham Defendants' collection and monitoring of customer surveys and complaints;

   d.   The Wyndham Defendants' requirement that franchisee submit regular and detailed reports to the Wyndham Defendants about day-to-day hotel operations;

   e.   The Wyndham Defendants' collection and monitoring of data about guests at the Subject Days Inn locations, including but not limited to room reservations,

38

identification and payment information, data from websites visited on Wi-Fi, and other guest data;

f. The Wyndham Defendants' supervision and control over day-to-day operations of the Subject Days Inn locations through detailed information and extensive reports that it obtained through the property management system and other software systems it required franchisee to use and through which franchisee was obligated to allow the Wyndham Defendants to obtain real-time data to allow it to monitor hotel operations on a day-to-day basis;

g. The Wyndham Defendants' regular inspections of each of the Subject Days Inn locations;

h. The Wyndham Defendants' employment of "field agents" to work with hotels on security issues, including trafficking issues;

i. The Wyndham Defendants' access to surveillance and security systems;

j. Information provided to the Wyndham Defendants by law enforcement; and

k. Other sources of information available to the Wyndham Defendants.

64. The Wyndham Defendants required hotel staff, management, and franchisees to report suspected criminal activity at the Subject Days Inn locations, including suspected sex trafficking, to the Wyndham Defendants.

65. Based on the obvious "red flags" of sex trafficking at the Subject Days Inn locations, Franchisee Defendants and the staff and management of the subject Days Inn locations were required to, and upon information and belief did, report numerous instances of suspected sex trafficking to the Wyndham Defendants before and during Jane Doe (R.N.H.)'s trafficking.

66. Upon information and belief, before and during Jane Doe (R.N.H.)'s trafficking, the Wyndham Defendants observed obvious "red flags" of numerous instances of sex trafficking occurring at the Subject Days Inn locations based on their supervision and monitoring of the properties.

**C. Defendants knew Jane Doe (R.N.H.) was being trafficked at the Days Inn East because of the apparent and obvious "red flags" of sex trafficking.**

67.    During the period that Jane Doe (R.N.H.) was trafficked at the Days Inn East, there were obvious signs that her traffickers were engaged in sex trafficking:

a.    The hotel rooms in which she was trafficked were frequently paid for with cash;

b.    Jane Doe (R.N.H.)'s trafficker was present with her at check in.

c.    When she was with a john her trafficker would often wait in the hotel's stairwell/hallway or linger outside in the parking lot. It was obvious to hotel staff that Jane Doe (R.N.H.) was being monitored and her freedom being restricted.

d.    Housekeeping constantly brought extra towels and would frequently change the sheets in the room Jane Doe and her trafficker obtained.

e.    Jane Doe (R.N.H.) had several johns every day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

f.    There was heavy foot traffic in and out of Jane Doe (R.N.H.)'s room involving men who were not hotel guests. This traffic was visible to hotel staff.

g.    After Jane Doe (R.N.H.) checked out, hotel cleaning staff would have noticed sex paraphernalia like excessive condom wrappers in the trash.

h.    Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel.

68.    Based upon information and belief, multiple employees at the Days Inn East, including management-level employees, observed or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

69.    As such, Days Inn East Franchisee knew or was willfully blind to the fact that Jane Doe (R.N.H.) was being trafficked at the Days Inn East.

70.    Given these obvious signs, the Wyndham Defendants knew or should have known about the trafficking of Jane Doe (R.N.H.) based on their policies or protocols that required hotel staff to report suspected criminal activity including sex trafficking.

40

71. The Wyndham Defendants also knew or should have known about the trafficking of Jane Doe (R.N.H.) based on the numerous tools, described above, through which they monitored and supervised the Days Inn East. The "red flags" of Jane Doe (R.N.H.)'s trafficking at this hotel were sufficiently obvious that, during the numerous times she was trafficked at this hotel, they were readily detectable through the oversight tools that the Wyndham Brand Defendant used.

72. The Wyndham Defendants and Days Inn East Franchisee had constructive knowledge of the trafficking of (R.N.H.) at the Days Inn East because that trafficking was the direct result of the Wyndham Defendants and Days Inn East Franchisee facilitating trafficking at the Days Inn East.

73. Based on their knowledge of the problem of sex trafficking in the hotel industry, at Wyndham branded hotels, and at the Days Inn East, the Wyndham Defendants and Days Inn East Franchisee each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at the Days Inn East and to make a reasonable investigation in response to signs of potential sex trafficking. If the Wyndham Defendants and Days Inn East Franchisee had used reasonable prudence, they would have been aware of Jane Doe (R.N.H.)'s trafficking at the Days Inn East and that they were benefiting from such trafficking.

**D. Defendants knew Jane Doe (R.N.H.) was being trafficked at the Days Inn Northwest because of the apparent and obvious "red flags" of sex trafficking.**

74. During the period that Jane Doe (R.N.H.) was trafficked at the Days Inn Northwest, there were obvious signs that her traffickers were engaged in sex trafficking:

 a. The hotel rooms in which she was trafficked were frequently paid for with cash.

 b. Jane Doe's trafficker was present with her at check in.

41

c.  At the instruction of her trafficker, Jane Doe waited for johns at the entrance of the hotel by the staff.

d.  Hotel staff made several comments towards Jane Doe indicating that they knew how she was making money.

e.  Housekeeping constantly brought extra towels and would frequently change the sheets in the room Jane Doe and her trafficker obtained.

f.   When she was with a john her trafficker would often wait in the hotel's stairwell/hallway or linger outside in the parking lot. It was obvious to hotel staff that Jane Doe (R.N.H.) was being monitored and her freedom being restricted.

g.  Hotel staff tried to illicit sex from Jane Doe.

h.  Jane Doe (R.N.H.) had several johns every day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

i.  There was heavy foot traffic in and out of Jane Doe (R.N.H.)'s room involving men who were not hotel guests. This traffic was visible to hotel staff.

j.  After Jane Doe (R.N.H.) checked out, hotel cleaning staff would have noticed sex paraphernalia like excessive condom wrappers in the trash.

k.  Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel.

75.  Based upon information and belief, multiple employees at the Days Inn Northwest including management-level employees, observed or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

76.  As such, Days Inn Northwest Franchisee knew or were willfully blind to the fact that Jane Doe (R.N.H.) was being trafficked at the Days Inn Northwest.

77.  Given these obvious signs, Wyndham Defendants knew or should have known about the trafficking of Jane Doe (R.N.H.) based on their policies or protocols that required hotel staff to report suspected criminal activity including sex trafficking.

78.  The Wyndham Brand Defendants also knew or should have known about the trafficking of Jane Doe (R.N.H.) based on the numerous tools, described above, through which

42

they monitored and supervised the Days Inn Northwest. The "red flags" of Jane Doe (R.N.H.)'s trafficking at this hotel were sufficiently obvious that, during the numerous times she was trafficked at this hotel, they were readily detectable through the oversight tools that the Wyndham Brand Defendant used.

79.    The Wyndham Defendants and Days Inn Northwest Franchisee had constructive knowledge of the trafficking of (R.N.H.) at the Days Inn Northwest because that trafficking was the direct result of the Wyndham Defendants and Days Inn Northwest Franchisee facilitating trafficking at the Days Inn Northwest.

80.    Based on their knowledge of the problem of sex trafficking in the hotel industry, at Wyndham branded hotels, and at the Days Inn Northwest, Wyndham Defendants and Days Inn Northwest Franchisee each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at the Days Inn Northwest and to make a reasonable investigation in response to signs of potential sex trafficking. If the Wyndham Defendants and Days Inn Northwest Franchisee had used reasonable prudence, they would have been aware of Jane Doe (R.N.H.)'s trafficking at the Days Inn Northwest and that they were benefiting from such trafficking.

**E. Defendants knew Jane Doe (R.N.H.) was being trafficked at the Days Inn North because of the apparent and obvious "red flags" of sex trafficking.**

81.    During the period that Jane Doe (R.N.H.) was trafficked at the Days Inn North, there were obvious signs that her traffickers were engaged in sex trafficking:

    a.   The hotel rooms in which she was trafficked were frequently paid for with cash.

    b.   Jane Doe's trafficker was present with her at check in.

    c.   Jane Doe and her trafficker would book two rooms at a time and staff knew they used one room for johns and the other for Jane Doe and her trafficker to sleep in.

    d.   Housekeeping constantly brought extra towels and would frequently change the sheets in the room Jane Doe and her trafficker obtained.

e. When she was with a john her trafficker would often wait in the second room, hotel's stairwell/hallway or linger outside in the parking lot. It was obvious to hotel staff that Jane Doe (R.N.H.) was being monitored and her freedom being restricted.

f. Jane Doe (R.N.H.) had several johns every day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

g. There was heavy foot traffic in and out of Jane Doe (R.N.H.)'s room involving men who were not hotel guests. This traffic was visible to hotel staff.

h. After Jane Doe (R.N.H.) checked out, hotel cleaning staff would have noticed sex paraphernalia like excessive condom wrappers in the trash.

i. Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel.

82. Based upon information and belief, multiple employees at the Days Inn North, including management-level employees, observed or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

83. As such, Wyndham Defendants and Days Inn North Franchisee knew or were willfully blind to the fact that Jane Doe (R.N.H.) was being trafficked at the Days Inn North.

84. Given these obvious signs, Wyndham Defendants knew or should have known about the trafficking of Jane Doe (R.N.H.) based on their policies or protocols that required hotel staff to report suspected criminal activity including sex trafficking.

85. The Wyndham Brand Defendants also knew or should have known about the trafficking of Jane Doe (R.N.H.) based on the numerous tools, described above, through which they monitored and supervised the Days Inn North. The "red flags" of Jane Doe (R.N.H.)'s trafficking at this hotel were sufficiently obvious that, during the numerous times she was trafficked at this hotel, they were readily detectable through the oversight tools that the Wyndham Brand Defendant used.

44

86.     The Wyndham Defendants and Days Inn North Franchisee had constructive knowledge of the trafficking of (R.N.H.) at the Days Inn North because that trafficking was the direct result of the Wyndham Defendants and Days Inn North Franchisee facilitating trafficking at the Days Inn North.

87.     Based on their knowledge of the problem of sex trafficking in the hotel industry, at Wyndham branded hotels, and at the Days Inn North, Wyndham Defendants and Days Inn North Franchisee each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at the Days Inn North and to make a reasonable investigation in response to signs of potential sex trafficking. If the Wyndham Defendants and Days Inn North Franchisee had used reasonable prudence, they would have been aware of Jane Doe (R.N.H.)'s trafficking at the Days Inn North and that they were benefiting from such trafficking.

IV.     **Defendants actively facilitated sex trafficking at the Subject Days Inn locations, including the trafficking of Jane Doe (R.N.H.)**

   A. **Days Inn East Franchisee Defendant facilitated the trafficking activity at their Days Inn location, including the trafficking of (R.N.H.)**

88.     Days Inn East Franchisee Defendant is responsible for the acts, omissions, and knowledge of employees of Days Inn East property when operating the hotel because these acts and omissions were committed in the scope and course of employment, because Days Inn East Franchisee Defendant ratified these acts and omissions, and because Days Inn East Franchisee Defendant failed to exercise reasonable care with regard to the hiring, training, and supervision of their employees given the specific risks, known to Days Inn East Franchisee, of human trafficking occurring in the Days Inn East location.

45

89. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Days Inn East location, Days Inn East Franchisee Defendant continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

90. Days Inn East Franchisee Defendant knew or was willfully blind to the fact that (R.N.H.) was being trafficked at the Days Inn East location and, despite this, benefited from continued association with her trafficker by providing them a venue in the form of hotel rooms and related services, to facilitate (R.N.H.)'s sexual exploitation.

91. Days Inn East Franchisee also facilitated widespread trafficking at the Days Inn East location, including the trafficking of (R.N.H.), in ways including:

a. developing relationships with traffickers, including (R.N.H.)'s trafficker, and creating an understanding that these traffickers could operate at their hotel without risk of interference;

b. continuing to provide rooms, services, and assistance to traffickers in the face of obvious "red flags" of trafficking of (R.N.H.) and other victims at the Days Inn East;

c. allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining their front-line staff regarding issues related to human trafficking;

d. inadequate and inadequately enforced sex trafficking notice and training for their hotel staff;

e. failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring at the Days Inn East;

f. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by their hotel staff;

g. providing rooms at the Days Inn East location in a designated area of the property allowing ease of access for "johns" but also minimizing risks of detection; and

h. accommodating specific requests made by traffickers at the Days Inn East location.

92.     Days Inn East Franchisee Defendant's acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Jane Doe (R.N.H.).

93.     Days Inn East Franchisee Defendant knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking at the Days Inn East location.

**B. Days Inn Northwest Franchisee Defendant facilitated the trafficking activity at their Days Inn location, including the trafficking of (R.N.H.)**

94.     Days Inn Northwest Franchisee Defendant is responsible for the acts, omissions, and knowledge of employees of Days Inn Northwest property when operating the hotel because these acts and omissions were committed in the scope and course of employment, because Days Inn Northwest Franchisee Defendant ratified these acts and omissions, and because Days Inn Northwest Franchisee Defendant failed to exercise reasonable care with regard to the hiring, training, and supervision of their employees given the specific risks, known to Days Inn Northwest Franchisee, of human trafficking occurring in the Days Inn Northwest location.

95.     Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Days Inn Northwest location, Days Inn Northwest Franchisee Defendant continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

96.     Days Inn Northwest Franchisee Defendant knew or was willfully blind to the fact that (R.N.H.) was being trafficked at the Days Inn Northwest location and, despite this, benefited

from continued association with her trafficker by providing them a venue in the form of hotel rooms and related services, to facilitate (R.N.H.)'s sexual exploitation.

97.     Days Inn Northwest Franchisee also facilitated widespread trafficking at the Days Inn Northwest location, including the trafficking of (R.N.H.), in ways including:

a. developing relationships with traffickers, including (R.N.H.)'s trafficker, and creating an understanding that these traffickers could operate at their hotel without risk of interference;

b. continuing to provide rooms, services, and assistance to traffickers in the face of obvious "red flags" of trafficking of (R.N.H.) and other victims at the Days Inn Northwest;

c. allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining their front-line staff regarding issues related to human trafficking;

d. inadequate and inadequately enforced sex trafficking notice and training for their hotel staff;

e. failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring at the Days Inn Northwest;

f. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by their hotel staff;

g. providing rooms at the Days Inn Northwest location in a designated area of the property allowing ease of access for "johns" but also minimizing risks of detection; and

h. accommodating specific requests made by traffickers at the Days Inn Northwest location.

98.     Days Inn Northwest Franchisee Defendant's acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Jane Doe (R.N.H.).

48

99.     Days Inn Northwest Franchisee Defendant knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking at the Days Inn Northwest location.

### C. Days Inn North Franchisee Defendant facilitated the trafficking activity at their Days Inn location, including the trafficking of (R.N.H.)

100.    Days Inn North Franchisee Defendant is responsible for the acts, omissions, and knowledge of employees of Days Inn North property when operating the hotel because these acts and omissions were committed in the scope and course of employment, because Days Inn North Franchisee Defendant ratified these acts and omissions, and because Days Inn North Franchisee Defendant failed to exercise reasonable care with regard to the hiring, training, and supervision of their employees given the specific risks, known to Days Inn North Franchisee, of human trafficking occurring in the Days Inn North location.

101.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Days Inn North location, Days Inn North Franchisee Defendant continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

102.    Days Inn North Franchisee Defendant knew or was willfully blind to the fact that (R.N.H.) was being trafficked at the Days Inn North location and, despite this, benefited from continued association with her trafficker by providing them a venue in the form of hotel rooms and related services, to facilitate (R.N.H.)'s sexual exploitation.

103.    Days Inn North Franchisee also facilitated widespread trafficking at the Days Inn North location, including the trafficking of (R.N.H.), in ways including:

      a.  developing relationships with traffickers, including (R.N.H.)'s trafficker, and creating an understanding that these traffickers could operate at their hotel without risk of interference;

49

b. continuing to provide rooms, services, and assistance to traffickers in the face of obvious "red flags" of trafficking of (R.N.H.) and other victims at the Days Inn North;

c. allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining their front-line staff regarding issues related to human trafficking;

d. inadequate and inadequately enforced sex trafficking notice and training for their hotel staff;

e. failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring at the Days Inn North;

f. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by their hotel staff;

g. providing rooms at the Days Inn North location in a designated area of the property allowing ease of access for "johns" but also minimizing risks of detection; and

h. accommodating specific requests made by traffickers at the Days Inn North location.

104. Days Inn North Franchisee Defendant's acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Jane Doe (R.N.H.).

105. Days Inn North Franchisee Defendant knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking at the Days Inn North location.

**D. The Wyndham Defendants facilitated the trafficking of Jane Doe (R.N.H.)**

106.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject Days Inn locations, Wyndham Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

107.    Wyndham Defendants knew or were willfully blind to the fact that Jane Doe (R.N.H.) was being trafficked and, despite this, benefited from continued association with her trafficker by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (R.N.H.)'s sexual exploitation.

108.    Wyndham Defendants participated directly in aspects of the operation of the subject Days Inn locations that influenced whether and to what extent trafficking occurred at the hotels, including but not limited to the trafficking of Jane Doe (R.N.H.), as follows:

a.  The Wyndham Defendants have publicly assumed responsibility and control over the human trafficking response of all Wyndham properties, including the Days Inn locations, including design and implementation of practices to prevent trafficking, safety and security procedures, employee and franchisee education, training, and response, partnership with external organizations, and advocacy;

b.  The Wyndham Defendants retained control over when its branded hotels would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in Wyndham branded hotels, such as the Days Inn hotels;

c.  The Wyndham Defendants retained control over the response to trafficking by creating a reporting hotline for hotel staff and franchisees to report suspected human trafficking to the Wyndham Defendants. The Wyndham Defendants determined when issues should be escalated to the National Human Trafficking Hotline or law enforcement;

d.  The Wyndham Defendants retained control over determining which hotels needed additional training or other resources based on a high risk of human trafficking and other related criminal activity;

e.  The Wyndham Defendants expressly retained control to terminate hotel staff and/or a franchising agreement based on the response to human trafficking;

f.  The Wyndham Defendants retained control, at the brand-wide level, over training on how to spot the signs of and help prevent human trafficking. The Wyndham Defendants determined whether the training is provided, when it is provided, the

51

content of the training, how the training is delivered, who receives the training, and the consequences if someone does not participate in the training or fails to follow such training;

g. Although they delayed making any reasonable effort to do so, the Wyndham Defendants acknowledge that they retain control to adopt requirements for franchised hotels specifically designed to prevent human trafficking and other criminal activity;

h. The Wyndham Defendants maintain a Safety & Security Team and a Critical Incident Rapid Response Team that are charged with investigating and responding to potential criminal incidents at all Wyndham properties, including suspected trafficking incidents;

i. The Wyndham Defendants are responsible for adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking at the subject Days Inn locations;

j. The Wyndham Defendants maintained control over all details of the terms under which franchised hotels, including the subject Days Inn locations, offered internet services to customers, including dictating the software, hardware, and service provider to be used, setting all policies about use and restrictions on use, and actively collecting and monitoring guest internet usage data. The Wyndham Defendants dictated whether sites frequently used to solicit clients for sex trafficking victims would be accessible through the internet at the subject Days Inn locations;

k. The Wyndham Defendants retained control over the setting, supervision, overseeing, and enforcement of detailed policies and protocol for housekeeping services at the subject Days Inn locations, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services; and

l. The Wyndham Defendants collected, maintained, and analyzed detailed data regarding housekeeping services at the subject Days Inn locations, including trends that would reveal patterns consistent with human trafficking.

109. Wyndham directly participated in and retained day-to-day control over renting rooms at all the subject Days Inn locations by, among other things:

a. The Wyndham Defendants controlled all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

b. The Wyndham Defendants directly made reservations for rooms at the subject Days Inn locations and accepted payment for those rooms through a central

52

reservation system that they controlled and operated. The Wyndham Defendants could reserve rooms and accept payments without requiring franchisee approval or involvement;

c. The Wyndham Defendants established and maintained control over a brand-wide "do not rent" system. The Wyndham Defendants set all policies related to use of this system and dictated the day-to-day details of reservations at the subject Days Inn locations through detailed policies that it established regarding use of this "do not rent" system;

d. The Wyndham Defendants controlled room rates, required discounts, mandatory fees, and rewards program;

e. The Wyndham Defendants controlled and restricted the ability of franchisee and staff to refuse or cancel a reservation;

f. The Wyndham Defendants controlled and oversaw policies and procedures regarding check-in, payment, and identity verification procedures;

g. The Wyndham Defendants collected, retained, monitored, and analyzed detailed data about every guest who stayed at the subject Days Inn locations;

h. The Wyndham Defendants established detailed policies and protocol that dictated, step-by-step, everything that would happen from the time a guest arrived at the subject Days Inn locations until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in; and

i. The Wyndham Defendants required franchisees to use Wyndham's property management system, which was owned, maintained, controlled, and operated by the Wyndham Defendants, for virtually all aspects of hotel operations regarding room reservations and payment.

110. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject Days Inn locations named herein, Wyndham continued renting rooms to traffickers, including the rooms used to traffic victims, including Jane Doe (R.N.H.)

111. Wyndham knew or should have known that Jane Doe (R.N.H.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them hotel rooms and related services to facilitate Jane Doe (R.N.H.)'s sexual exploitation.

112. The Wyndham Defendants formed a business relationship with traffickers at the Subject Days Inn locations by renting rooms, collecting guest data, and operating the hotels in a way that attracted business from traffickers and allowed them to operate efficiently with minimal risk of detection or traceability.

113. Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the subject Days Inn locations, the Wyndham Defendants continued participating in a venture at these hotels, with its franchisees and hotel staff, in a way that it knew or should have known would lead to additional sex trafficking at the hotels, including but not limited to by the following:

    a. The Wyndham Defendants adopted inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining franchisees and hotel staff regarding issues related to human trafficking;

    b. The Wyndham Defendants provided inadequate training on issues related to human trafficking and unreasonably delayed providing training;

    c. The Wyndham Defendants adopted a safety and security budget and safety and security practices that were clearly insufficient considering the known problem of sex trafficking at their properties;

    **d.** The Wyndham Defendants implicitly approved decisions by franchisees and hotel staff not to report or respond to criminal activity including sex trafficking appropriately;

    e. The Wyndham Defendants continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking at the subject Days Inn locations;

    f. The Wyndham Defendants attracted traffickers by affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal;

    g. Despite having specific knowledge of policies that would significantly reduce sex trafficking at its branded locations including the subject Days Inn locations, the Wyndham Defendants declined to implement policies that would likely have the effect of reducing its sex-trafficking related profits or that would require publicly acknowledging the ongoing problem of sex trafficking at its properties;

54

h. The Wyndham Defendants willfully delayed taking obvious and apparent steps to stop facilitating sex trafficking, which they had the ability and responsibility to take sooner;

i. The Wyndham Defendants allowed traffickers to reserve rooms using cash, which provided relative anonymity and non-traceability; and

j. The Wyndham Defendants provided traffickers with access to internet services in a manner that the Wyndham Defendant knew or should have known would be used to facilitate trafficking by promoting commercial sex services online.

114. If Wyndham Defendants had exercised reasonable diligence when operating Subject Days Inn locations and in the areas where they retained control, Wyndham Defendants would have prevented the Subject Days Inn locations from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (R.N.H.). Instead, Wyndham Defendants engaged in the course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (R.N.H.).

V.    **Defendants' Ventures at the Subject Days Inn Locations**

115. Each of the Franchisee Defendants and the Wyndham Defendants benefited from use of their respective Subject Days Inn locations for sex trafficking. Jane Doe (R.N.H.)'s traffickers and other traffickers rented rooms at the Subject Days Inn locations and used these hotels to harbor, maintain, and provide victims including Jane Doe (R.N.H.). When these traffickers rented rooms, both the respective Franchisee Defendant and the Wyndham Brand Defendants received a financial benefit.

116. Each Franchisee Defendant generated revenue every time a sex trafficker rented a room at is respective Subject Days Inn location, both from room rental fees and from fees for other hotel services

117. Each of the Wyndham Brand Defendants generated substantial income from operations of hotels such as the Subject Days Inn locations. In exchange for providing the

55

services described above, each of the Wyndham Brand Defendants received a share of the revenue from room rentals collected at the Subject Days Inn locations. The fees generated by the Wyndham Brand Defendants are primarily based on gross room rentals; therefore, the Wyndham Brand Defendants' revenue increase with each room rental at the Subject Days Inn locations. Revenue generated from rooms rented at the Subject Days Inn locations was distributed among the Wyndham Brand Defendants, with each benefiting from each rental of a hotel room by traffickers.

118.    The Wyndham Brand Defendants also benefited from sex traffickers' frequent use of the Subject Days Inn locations because this regular and routine use of those hotels increased the hotel occupancy rate, and an increase in the hotel occupancy rate resulted in several benefits for the Wyndham Brand Defendants, including that this assisted them in obtaining financing and helped them market franchising opportunities to potential franchisees.

119.    In ways described more fully above, the Wyndham Defendants and Franchisee Defendants knowingly received a financial benefit from participating in a venture in the form of a continuous business relationship and implicit understanding with the traffickers operating out of Subject Days Inn locations, including Jane Doe (R.N.H.)'s trafficker. (hereinafter "Venture 1").

120.    The Wyndham Defendants and each Franchisee Defendant formed this continuous business relationship and implicit understanding with the traffickers at the Subject Days Inn locations by continuing to rent rooms to be used for trafficking (including Jane Doe (R.N.H.)'s trafficking) after the Wyndham Defendants and each Franchisee Defendant knew or should have known that the rooms were being used for unlawful trafficking.

121. This business relationship involved mutual pursuant of financial benefit: the traffickers were renting the hotel rooms to generate revenue from sex trafficking and the Wyndham Defendants and Franchisee Defendants were generating revenue by renting the hotel rooms.

122. This implicit understanding developed because sex traffickers, including Jane Doe (R.N.H.)'s trafficker, frequently used the Subject Days Inn locations for their trafficking knowing that staff members would look the other way. This occurred because of the acts and omissions of the Wyndham Defendants and Franchisee Defendants that created a favorable environment for sex trafficking to flourish. Multiple traffickers operated at each of these hotels, and multiple victims were harbored, provided, and exploited at each of these hotels.

123. Both the Wyndham Defendants and each of the Franchisee Defendants participated in this venture by acting jointly to rent rooms to traffickers and to operate these hotels in a way that attracted business from traffickers and facilitated their trafficking activity. As further described above, each Franchisee Defendant provided "boots on the ground" at its respective hotel, and the Wyndham Defendants played a primary role in renting rooms at each of the Subject Days Inn locations and retained control over and was directly involved in aspects of hotel operations related to sex trafficking.

124. The Wyndham Defendants and each Franchisee Defendant participated in the venture by continually renting rooms to traffickers, including Jane Doe (R.N.H.)'s, after they knew or should have known that victims like Jane Doe (R.N.H.) were being subjected to unlawful trafficking. They also continued operating the hotel in a way that they knew or should have known would encourage traffickers to select the Subject Days Inn locations as venues for their illegal activities.

125. The Wyndham Defendants and Franchisee Defendants did not only provide these traffickers with a physical space (harboring) where they could imprison victims and sell them "johns" (providing), but they also provided these traffickers with the cover of a legitimate business as a venue where they could profit from sexual exploitation with a low risk of disruption. This was done pursuant to an implicit agreement with traffickers, which is evidenced by, among other things:

a. The traffickers, including Jane Doe (R.N.H.)'s, were familiar to the staff at each of the Subject Days Inn locations;

b. These traffickers reduced their operating burden because they did not need to make significant efforts to conceal their activities from the staff at the Subject Days Inn locations but, instead, freely made requests that would facilitate their trafficking activities without concern for detection or interference by the staff;

c. Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments and not requiring identification from appropriate parties; and

d. Defendants provided additional services to traffickers (including Jane Doe (R.N.H.)'s trafficker), including but not limited to, internet access, excessive towels, and extra housekeeping services to clean the activities of the trafficking venture once the traffickers vacated the rooms.

126. The criminal traffickers operating at the Subject Days Inn locations as part of Venture 1 violated 18 U.S.C. §1591 as to victims including Jane Doe (R.N.H.)

127. If Wyndham Defendants and Franchisee Defendant had not continued participating in a venture that they knew or should have known engaged in violations of the TVPRA, they would not have received a benefit from (R.N.H.)'s trafficking at Subject Days Inn locations.

128. In ways described more fully above, the Wyndham Defendants and Franchisee Defendants also knowingly received a financial benefit from participating in a commercial hotel-operating venture at their respective Subject Days Inn locations (hereinafter "Venture 2").

129. The Wyndham Defendants had a longstanding business relationship with each of the Franchisee Defendants pursuant to which they jointly participated in operation of their respective Subject Days Inn locations with a shared goal of maximizing revenue, including gross room revenue.

130. The Wyndham Defendants and Franchisee Defendants, through their respective roles in hotel operations as described above, facilitated widespread sex trafficking at the Subject Days Inn locations by continuing to operate the hotels in a way that they knew or should have known resulted in them benefiting from significant sex trafficking occurring on site at this hotel.

131. Venture 2 was engaged in a violation of the TVRPA through the widespread sex trafficking at each of the Subject Days Inn locations, which resulted in Jane Doe (R.N.H.) and other victims being harbored, maintained, and provided in the rooms of the Subject Days Inn locations. Venture 2 also engaged in a violation of the TVPRA through the actions of each of the Franchisee Defendants who violated the TVPRA as perpetrators by harboring sex trafficking victims as defined by 18 U.S.C §1591(a)(1) and by participating in a criminal trafficking venture as defined by 18 U.S.C §1591(a) (2).

132. Despite their actual or constructive knowledge that Venture 2 was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), the Wyndham Defendants and Franchisee Defendants participated in the venture by continuing to operate the Subject Days Inn locations in a way that they knew or should have known would lead to further violations of 18 U.S.C. §1591, including the trafficking of Jane Doe (R.N.H.). The Wyndham Defendants provided Franchisee Defendants with operational support, use of trademarks, marketing services, and other resources to operate the Subject Days Inn locations in a way that they knew or should have known was engaging in violations of 18 U.S.C §1591(a).

## VI.    Franchisee Defendants and the Staff at their Subject Days Inn location Acted as Actual Agents of Wyndham

133.    Wyndham Defendants are vicariously liable for the acts, omissions, and knowledge of Franchisee Defendants and staff at their respective Subject Days Inn location, which are Wyndham Defendants' actual agents or subagents.

134.    The Wyndham Defendants subjected Franchisee Defendants to detailed standards and requirements regarding the operation of their respective Days Inn location through the franchising agreement, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the Wyndham Defendants as they oversaw and supervised hotel operations at each subject location.

135.    The Wyndham Defendants obscure the full extent of control they exercise over the franchisees by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. The standards that the Wyndham Defendants imposed on the franchisees:

a. did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendants used; and

b. covered virtually all aspects of hotel operations, including but not limited to personnel, building, grounds, furnishings, fixtures, decor, equipment, vehicles, supplies, foodstuffs, printed matters, and internal operating functions; and

c. dictated the specific manner in which Franchisee Defendants and their respective hotel staff must carry out most day-to-day functions; and

d. significantly exceeded what was necessary for Wyndham to protect its registered trademarks.

136.    In addition to the ways described above, upon information and belief, Wyndham Defendants exercised and reserved the right to exercise systemic and pervasive control over

Franchisee Defendants' day-to-day operation of their respective Days Inn property. The ways that the Wyndham Defendants exercised this control include:

a. Wyndham Defendants required franchisees and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for Wyndham to protect its registered trademarks;

b. Wyndham Defendants maintained a team of regionally based trainers to provide training at branded hotels. Wyndham provided training for hotel management and select hotel staff on-site and at locations selected by Wyndham;

c. Wyndham Defendants provided hotels staff with training it created through an online learning platform, Wyndham University, it controlled and maintained, including training specific to hotel-based jobs, such as safety and security training for housekeeping staff and safety and security training for the front desk;

d. Wyndham Defendants controlled training provided by franchisees to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e. Wyndham Defendants retained sole discretion to determine whether all training had been completed satisfactorily;

f. Wyndham Defendants maintained oversight in hiring, disciplining, and terminating hotel management and employees;

g. Wyndham Defendants required franchisees to participate in mandatory centralized services for day-to-day operation of the hotels;

h. For certain products and services that franchisees were required to purchase to operate the property, Wyndham Defendants designated approved vendors and prohibited franchisees from purchasing goods and services from anyone other than an approved vendor;

i. Wyndham Defendants required franchisees to use its revenue management system, through which it dictated pricing and strategies to maximize revenue, and which gave it direct ability to supervise day-to-day operations at the hotels through direct access to the system;

j. Wyndham Defendants set required staffing levels for the subject properties;

k. Wyndham Defendants established detailed job descriptions for all positions in its branded properties and drafted numerous, detailed policies that referenced these

61

positions and dictated which positions must perform which tasks and how they must do so;

l.  Wyndham Defendants set requirements for the hiring process used by franchisees and oversaw employee discipline processes and termination decisions;

m.  Wyndham Defendants provided benefits for employees of franchised hotels;

n.  Wyndham Defendants controlled channels for guests to report complaints or provide feedback regarding the subject properties and directly participated in the response and/or supervised and the response to customer complaints or other feedback. Wyndham retained the right to provide refunds or other compensation to guests and to require Franchisee Defendants to pay associated costs;

o.  Wyndham Defendants generated reports and analysis of guest complaints and online reviews for the subject properties;

p.  Wyndham Defendants set detailed requirements for insurance that Franchisee Defendants must purchase;

q.  Wyndham Defendants exercised or retained control over the franchisees' day-to-day accounting and banking practices;

r.  Wyndham Defendants regularly audited the books and records of Franchisee Defendants;

s.  Wyndham Defendants conducted frequent and unscheduled inspections of the subject properties;

t.  Wyndham Defendants retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreement if franchisees violated any of Wyndham' detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the subject properties;

u.  Wyndham Defendants controlled all marketing for the subject properties, directly provided marketing services, and prohibited Franchisee Defendants from maintaining any online presence unless specifically reviewed and approved by Wyndham;

v.  Wyndham Defendants exercised or retained control over all aspects of building and facility design;

w. Wyndham Defendants imposed detailed recordkeeping and reporting requirements on Franchisee Defendants regarding virtually all aspects of hotel operations;

x. Wyndham Defendants supervised and controlled day-to-day operations of the subject properties through detailed information and extensive reports that it obtained through the property management system and other software systems it required Franchisee Defendants to use;

y. Wyndham Defendants required the franchisees and hotel staff to implement a data system that gives Franchisor real-time information that it can monitor on a day-to-day basis; and

z. Wyndham Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

137. The Wyndham Defendants had the right to and did enforce its control over Franchisee Defendants through various methods, including:

a. the right to conduct detailed inspections of the subject properties;

b. monitoring or auditing the Franchisee Defendants for compliance with policies and expectations;

c. directing Franchisee Defendants to take specific steps to come into compliance with detailed and exacting standards regarding day-to-day operations;

d. mandating training and education for franchisees and/or hotel staff;

e. employing consultants or field agents to become involved in the day-to-day operations of franchised hotels;

f. the right to impose fines or penalties;

g. the right to impose additional conditions on franchisees or to restrict or limit its right to provide goods and services; and

h. the right to terminate the franchise agreement for failure to comply with policies that govern the means and methods used for day-to-day operations.

138. The Wyndham Defendants are also vicariously liable for Franchisee Defendants and the hotels staff because, as further described above, they retained and exercised control over the specific instrumentalities and aspects of operations that caused Jane Doe (R.N.H.)'s harm,

63

including but not limited to reservations of rooms, hotel security, and detection of and response to suspected sex trafficking. They Wyndham Defendants had the right to exercise detailed, day-to-day control over and involvement in these areas. It also regularly and closely monitored these areas.

**VII.    Defendants are Jointly and Severally Liable for Jane Doe (R.N.H.)'s Damages.**

139.    The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to Jane Doe (R.N.H.).

140.    Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Jane Doe (R.N.H.) for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

<u>CAUSES OF ACTION—SEX TRAFFICKING UNDER THE TVPRA</u>

141.    Jane Doe (R.N.H.) incorporates all other allegations.

**I.    Cause of Action: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a) (Days Inn East Franchisee)**

142.     Jane Doe (R.N.H.) is a victim of sex trafficking within the meaning of § 1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

143.    Days Inn East Franchisee Defendant is a perpetrator within the meaning of 18 U.S.C §1595(a) because they:

    a.  violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, they harbored individuals (including Jane Doe (R.N.H.)) knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at the Days Inn East property.

    b.  violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, they knowingly received financial benefit by

64

knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at the Days Inn East property.

144.   Violations of 18 U.S.C §1595(a) by Days Inn East Franchisee Defendant as "perpetrator" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (R.N.H.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Days Inn East property.

**II.   Cause of Action: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a) (Days Inn Northwest Franchisee)**

145.    Jane Doe (R.N.H.) is a victim of sex trafficking within the meaning of § 1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

146.   Days Inn Northwest Franchisee Defendant is a perpetrator within the meaning of 18 U.S.C §1595(a) because they:

c.   violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, they harbored individuals (including Jane Doe (R.N.H.)) knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at the Days Inn Northwest property.

d.   violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, they knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at the Days Inn Northwest property.

147.   Violations of 18 U.S.C §1595(a) by Days Inn Northwest Franchisee Defendant as "perpetrator" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (R.N.H.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Days Inn Northwest property.

**III.   Cause of Action: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a) (Days Inn North Franchisee)**

148.    Jane Doe (R.N.H.) is a victim of sex trafficking within the meaning of § 1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

149.    Days Inn North Franchisee Defendant is a perpetrator within the meaning of 18 U.S.C §1595(a) because they:

e.  violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, they harbored individuals (including Jane Doe (R.N.H.)) knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at the Days Inn North property.

f.  violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, they knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at the Days Inn North property.

150.    Violations of 18 U.S.C §1595(a) by Days Inn North Franchisee Defendant as "perpetrator" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (R.N.H.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Days Inn North property.

## IV.    Cause of Action: Beneficiary Liability under §1595(a) of the TVPRA (all Defendants)

151.    Jane Doe (R.N.H.) is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

152.    Through acts and omissions described throughout this Complaint, Franchisor Defendants and Franchisee Defendants received a financial benefit from participating in a

66

venture with traffickers, including Jane Doe (R.N.H.)'s trafficker, despite the fact that each defendant knew or should have known that these traffickers, including Jane Doe (R.N.H.)'s trafficker, were engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2). Thus, Franchisor Defendants and Franchisee Defendants are liable as a beneficiary under 18 U.S.C §1595(a).

153.    Through the acts and omissions described throughout this Complaint, Franchisor Defendants received a financial benefit from participating in a venture with its respective franchisees regarding the operations of its respective hotel properties even though Franchisor Defendants knew or should have known that this venture was violating 18 U.S.C §§ 1591(a) and 1595(a).

154.    Violations of 18 U.S.C §1595(a) by Wyndham Defendants as "beneficiaries" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (R.N.H.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

## V.    Cause of Action: Vicarious Liability for TVPRA Violations (Franchisor Defendants)

155.    Franchisee Defendants acted as the actual agents of Wyndham Defendant when operating their respective Days Inn location. The agency relationship between Franchisee Defendants and each Wyndham Defendant lasted for the period during which the Wyndham Defendants were involved in operation of the Subject Days Inn locations through its role as franchisor.

156.    Through the acts and omissions described throughout this Complaint, each Wyndham Defendant, at the relevant time, exercised or retained the right to exercise systematic

and day-to-day control over the means and methods used by Franchisee Defendants to operate their respective Days Inn location.

157.     Under the TVPRA and the federal common law, a principal is vicariously liable for the violations of its actual agent and its subagents.

158.     As a result of the relationship between Franchisee Defendants and Wyndham Defendants, Franchisors are vicariously liable for the acts of Franchisees, including at the Subject Days Inn location. Factors that support this allegation are that Franchisors shared profits, standardized employee training, standardized and strict rules of operations, Franchisors controlled pricing and reservations, regularly conducted inspections, operational support and control, and other acts described above. Finally, Franchisors had the right to terminate any franchisee that failed to comply with the requirements promulgated by Franchisors. Thus, Franchisors retained control, or the right to control, the mode and manner of work contracted for.

159.     Each Defendant's failure to train and supervise their agents and employees, which was unreasonable in light of the known risk of sex trafficking at their respective Days Inn location, enabled and contributed to the sex trafficking of Jane Doe (R.N.H.).

160.     As alleged above, Wyndham Defendants are directly liable to Jane Doe (R.N.H.) for violations of the TVPRA as a beneficiary under 18 U.S.C §1595(a). Franchisee Defendants are also directly liable to Jane Doe (R.N.H.) under § 2255. Wyndham Defendants are vicariously liable to Jane Doe (R.N.H.) for those same violations.

## **DISCOVERY RULE**

161.     To the extent Defendants assert an affirmative defense of limitations, Jane Doe (R.N.H.) also invokes the continuing tort doctrine because this lawsuit arises out of a pattern of

continuous and ongoing tortious conduct by Defendants, individually and in concert, across the subject locations.

162. Jane Doe (R.N.H.) was subject to continuous trafficking at the subject hotels through at least 2016, which is not more than 10 years before Jane Doe (R.N.H.) filed this lawsuit.

163. This continuous trafficking resulted from Defendants' continuous facilitating of trafficking at the subject hotels and Defendants' ongoing venture with one another and with criminal traffickers.

## DAMAGES

164. Defendants' acts and omissions, individually and collectively, caused Jane Doe (R.N.H.) to sustain legal damages.

165. Defendants are joint and severally liable for all past and future damages sustained by Jane Doe (R.N.H.).

166. Jane Doe (R.N.H.) is entitled to be compensated for personal injuries and economic damages, including:

    a. Actual damages (until trial and in the future)

    b. Incidental and consequential damages (until trial and in the future);

    c. Mental anguish and emotional distress damages (until trial and in the future);

    d. Lost earnings and lost earning capacity (until trial and in the future);

    e. Necessary medical expenses (until trial and in the future);

    f. Life care expenses (until trial and in the future);

    g. Physical pain and suffering (until trial and in the future);

    h. Physical impairment (until trial and in the future);

i.   Emotional impairment (until trial and in the future);

j.   Exemplary/Punitive damages;

k.   Attorneys' fees; and

l.   Costs of this action.

m.   Pre-judgment and all other interest recoverable.

## JURY TRIAL

167.   Jane Doe (R.N.H.) demands a jury trial on all issues.

## RELIEF SOUGHT

168.   WHEREFORE, Jane Doe (R.N.H.) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (R.N.H.) against all Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Jane Doe (R.N.H.) may, in law or in equity, show herself to be justly entitled.

Respectfully submitted,

**LOCKS LAW FIRM**

Dated: 11/25/24                  By:   s/ Francesca A. Iacovangelo
                                 FRANCESCA A. IACOVANGELO, ESQ.
                                 601 Walnut Street, Suite 720 E
                                 Philadelphia, PA 19147
                                 (215) 893-3454
                                 (215) 893-3444 Facsimile
                                 fiacovangelo@lockslaw.com
                                 *Attorneys for Plaintiff*

70